706 So.2d 1349 (1998)
Larry D. RICHARDSON, Appellant,
v.
STATE of Florida, Appellee.
No. 86011.
Supreme Court of Florida.
January 29, 1998.
*1350 Paul J. Dubbeld, Daytona Beach, for Appellant.
Robert A. Butterworth, Attorney General, and Mark S. Dunn, Assistant Attorney General, Tallahassee, for Appellee.
PER CURIAM.
We have on appeal the judgment and sentence of the trial court imposing the death penalty upon appellant Larry D. Richardson. We have jurisdiction. Art. V, § 3(b)(1), Fla. Const. We reverse and order a new trial because of the improper admission of a confession given to a police officer during plea negotiations contrary to the express provisions of Florida Rule of Criminal Procedure 3.172(h), which specifically prohibit the admission of statements given during plea negotiations.

APPEAL
Richardson raises ten claims of error on appeal.[1] Because the plea negotiations issue is dispositive, we treat it first.

FACTS
Richardson was convicted after his third jury trial. His first two trials ended with the juries unable to reach a decision. The main evidence against Richardson was the testimony of Detective John Ladwig who testified that Richardson confessed to the murder when, upon Richardson's request, Ladwig visited him in jail. At the time, Richardson *1351 was representing himself and was engaged in plea negotiations with the State through Ladwig. Richardson asserts that either his confession was involuntary, and given as the result of promises made by the State in the negotiations, or it was inadmissible because it was given as part of ongoing plea negotiations.
The record reflects, without dispute, that Richardson was engaged in plea negotiations and that Ladwig was acting as the negotiator between Richardson and the State Attorney prosecuting the case, David Damore. In fact, at the time when Richardson is alleged to have confessed, an agreement already signed by the State Attorney was actually presented to him by Ladwig, based upon their previous negotiations, that essentially provided that if Richardson confessed he would be allowed to plead guilty to second-degree murder, thereby eliminating any risk of the death penalty. Further, at the same time plea negotiations were going on in this case, Richardson successfully negotiated a plea agreement with the State in another case.[2]
The agreement that the State prepared and signed, and that Ladwig presented to Richardson at the time of the alleged confession provided that:
ADDENDUM TO WRITTEN PLEA AGREEMENT
THE STATE OF FLORIDA, by and through the undersigned Assistant State Attorney, the defendant Larry Donnell Richardson, (pro se) does hereby agree as follows:
1. The defendant hereby agrees to enter a plea of guilty to murder in the Second Degree, a felony of the first degree punishable by imprisonment of a term of years not exceeding life, and Use of a Firearm during the Commission of a Felony, a second degree felony punishable by 15 years imprisonment, and fines of $10,000 each plus statutory court costs.
2. The defendant agrees to give a full and complete proffer (statement) admitting his murdering Mrs. Carrie Lee on or about February 14, 1991.
3. The State agrees to allow the Defendant to plead guilty to the charge of Murder in the Second Degree, and the Use of a Firearm during the Commission of a Felony.
4. The defendant will be sentenced as an Habitual Violent Offender. The defendant acknowledges that he qualifies as an Habitual Violent Offender and that photo-copies of documents introduced at his sentencing hearing on November 21, 1991, before Judge Gayle Graziano shall be admissible in this sentencing proceeding.
5. The defendant will receive a sentence of natural life with a mandatory minimum of fifteen (15) years imprisonment for Murder of the Second Degree and a thirty (30) year sentence with a ten (10) year mandatory minimum as an Habitual Violent Offender and a three year minimum sentence for the use of a firearm. The sentences shall run concurrent and with those sentences imposed by Judge Graziano on November 21, 1991.
6. All statements made by the defendant, whether oral/written or taped statements, depositions or trial testimony, can be used against him in the event the defendant fails to comply with the terms of this agreement.
7. The defendant shall have no right to withdraw this plea.
8. The undersigned Assistant will assist Assistant State Attorney Carl Zollezzi with the petition to the Governor's Office to transfer the defendant's sentences on these charges for incarceration in the State of Massachusetts. The State has advised the defendant that there are no guarantees that the Governor of the State of Florida or Governmental authorities in Massachusetts *1352 will honor the State's petition and that there is no statutory authority allowing for the defendant to serve his Florida sentence in Massachusetts.
9. The defendant waives any right to a Pre-Sentence Investigation.
The agreement does not mention when the confession was to be made or set a deadline for the agreement's execution by both parties.
Immediately after Richardson's alleged statement was made to him,[3] Detective Ladwig wrote a report stating that he told Richardson "the state would be willing to discuss a plea negotiation with him provided he would first provide me with a true and complete confession to the murder of Carolyn Lee. Larry Richardson agreed."[4] The record reflects that similar wording occurred in Ladwig's other police reports describing his negotiations with Richardson dated November 7 and November 20, and one dated earlier that same day, November 22, 1991. For example, in Ladwig's November 7 report he wrote that he told Richardson, "Prior to any signed agreement between him and the State, Richardson would have to provide a full confession to the Carrie Lee case." Similarly, in his first report written on November 22, Ladwig stated that, "I advised Larry that if he still wished to confess to the murder of Carolyn Lee then I would first need his true confession if in fact he did kill Carolyn Lee, then we would present that to the State Attorney for consideration of new plea negotiations." Thus, Ladwig's written statements, as well as the written plea agreement, confirm the continuing and consistent efforts of the State to strike a bargain with Richardson in exchange for his statement.
Ladwig testified at the hearing on Richardson's motion to suppress his alleged confession and stated that he told Richardson he would not be getting the benefit of the written plea bargain signed by the State Attorney if he confessed without signing the agreement. Ladwig also testified as to the extensive negotiations he had with Richardson, and he detailed the arrangements Richardson sought and Richardson's reasons for declining to sign the State's agreement on November 22, 1991. Ladwig stated that initially he went to see Richardson to present a written plea negotiation signed by Mr. Damore that was based on his previous negotiations with Richardson;[5] second, Richardson never wanted any statements regarding Ms. Lee's murder to be on the record; third, Richardson refused to sign the agreement because he objected to several of the conditions;[6] and finally, in response to Richardson's query whether he could confess before he signed the plea offer, Ladwig told him if he confessed before signing, "you have no plea, you have nothing." Ladwig then testified that Richardson responded that he understood and then asked the same question again. Ladwig said, "No, Larry ... but if you don't sign that and confess to me, you have absolutely nothing. His [Richardson's] response was, I'll worry about that later. I'll give you the confession." The trial judge[7] denied Richardson's motion to suppress his confession prior to his first trial and a successor judge[8] stood by that ruling at the third trial.

LAW AND ANALYSIS
At issue is Florida Rule of Criminal Procedure 3.172(h), which states that:

*1353 Except as otherwise provided in this rule, evidence of an offer or a plea of guilty or nolo contendere, later withdrawn, or of statements made in connection therewith, is not admissible in any civil or criminal proceeding against the person who made the plea or offer.
In construing which statements fall within the ambit of the exclusion, we have adopted the two-tiered analysis used in United States v. Robertson, 582 F.2d 1356 (5th Cir.1978). See Groover v. State, 458 So.2d 226, 228 (Fla.1984); Bottoson v. State, 443 So.2d 962, 965 (Fla.1983). In the first step of the analysis, the trial court must determine "whether the accused exhibited an actual subjective expectation to negotiate a plea at the time of the discussion." Robertson, 582 F.2d at 1366. In applying the first prong, the trial court must carefully distinguish between the accused's admissions and the accused's attempts to negotiate a plea bargain. In other words, the trial court "must appreciate the tenor of the conversation." Id. at 1367. From there, the trial court must then discern "whether the accused's expectation was reasonable given the totality of the circumstances." Id. at 1366.
This Court was presented with a situation similar to that involved here in Anderson v. State, 420 So.2d 574 (Fla.1982). In Anderson, the defendant was being transported by police officers from Minnesota to Florida to face murder charges and made an incriminating statement to them during the trip. In ruling that admission of the statement violated both the Sixth Amendment and rule 3.172(h), we declared that:
We also agree that Anderson made the February statement during plea negotiations, which renders that statement inadmissible. Both Florida Rule of Criminal Procedure 3.172(h), currently in effect, and former rule 3.171(d), in effect when Anderson entered his plea, forbid admitting into evidence statements made during plea negotiations. The state argues that the discussion during which Anderson offered to plead guilty if the state would forego seeking the death penalty did not constitute plea bargaining because the deputies did not have the authority to negotiate a plea. Testimony at the suppression hearing, however, established that both Anderson and his attorney believed that they were bargaining for a plea and that the senior deputy had spoken with the state attorney by telephone regarding talking with Anderson. In his testimony at the hearing, the other deputy referred to the February discussion as "plea negotiations." On the totality of the circumstances the deputies' disavowal to Anderson and his Minnesota attorney that they could finalize a plea bargain on the spot does not remove the February statement from the process of plea negotiations.
The facts of this case demonstrate that Anderson actively sought to negotiate a plea agreement and did not merely make an admission. The February statement, thus, fits within the two-tiered analysis for determining whether a discussion should be characterized as a plea negotiation, as set out in United States v. Robertson, 582 F.2d 1356 (5th Cir.1978):
[F]irst, whether the accused exhibited an actual subjective expectation to negotiate a plea at the time of the discussion, and, second, whether the accused's expectation was reasonable given the totality of the circumstances.

Id. at 1366. The cases relied on by the state involved unilateral offers by the individual defendants and are factually distinguishable from the instant case. We find that Anderson's February statement meets the Robertson test and that the trial court erred in not suppressing that statement.
420 So.2d at 576-77 (footnotes omitted).
In addition to Anderson, we also find instructive a recent case involving similar circumstances from the Kentucky Supreme Court. See Roberts v. Commonwealth, 896 S.W.2d 4 (Ky.1995). There, the defendant sought to avoid Kentucky's version of a habitual felony offender sentence enhancement. Id. at 5. To that end, he asked Detective Duncan to contact the state attorney about a plea bargain. The state attorney assured Duncan that the defendant would not be charged as a habitual felony offender if he gave "a complete, detailed and truthful statement" regarding a series of unsolved armed *1354 robberies. In turn, Duncan relayed this information to Roberts, as confirmed in a taped statement Roberts gave the police. Roberts confessed to eight robberies, while denying that he committed any other robberies. Over a motion to suppress, Roberts' statement was admitted at trial. He was convicted of eleven counts of robbery and his twenty-year sentence for each count was enhanced to fifty years for each count. Id.
On direct appeal, the Kentucky Supreme Court adopted the Robertson analysis, found that Duncan acted as the state attorney's authorized negotiator with Roberts, and concluded that "[t]here was a quid pro quo. Each side made a concession. This was clearly a `plea discussion.'" Id. at 6. Accordingly, the court held that Roberts' statement was admitted in violation of rule 410[9] of the Kentucky Rules of Evidence (KRE), reversed his conviction, and remanded the case for a new trial. Id. at 6-7.
The facts of this case are analogous to Roberts and even stronger as to ongoing plea negotiations than in Anderson. Further, it is apparent that both parts of the Robertson test are met here, since it is undisputed that the statement took place during the process of ongoing plea negotiations when a written plea agreement predicated upon prior plea discussions, and already fully executed by the State Attorney, was presented to Richardson for consideration. Clearly, as in Roberts, the State's offer here contemplated that as a quid pro quo, Richardson would "give a full and complete proffer (statement) admitting his murdering Mrs. Carrie Lee on or about February 14, 1991." Hence, the circumstances support both a "subjective expectation" on Richardson's part to negotiate a plea, and a reasonable basis for the expectation, evidenced by the State's obvious desire to negotiate a plea, which included repeated oral offers conditioned upon a statement and a written offer including the same condition.
As in Anderson, we reject any suggestion that the police officer, Ladwig, was not authorized to negotiate or that the plea negotiations ended when, because the defendant objected to some of the terms of a written agreement, no final agreement was concluded on the day in question.[10] Here the officer conceded that he was negotiating in order to secure a statement, and, indeed, he came to the negotiations armed with a written and signed agreement from the State. Further, as in Anderson, the undisputed facts demonstrate that Richardson also repeatedly and consistently "actively sought to negotiate a plea agreement" and his actions were not "unilateral offers" but were part of bilateral negotiations between the parties. 420 So.2d at 577. Further, as noted above, at the same time these negotiations were going on Richardson successfully negotiated a plea agreement with the State in another pending case, and the parties were obviously close to an agreement here. It is undisputed that the entire purpose of Ladwig's meeting with Richardson was for the continuing purpose of negotiating an agreement to get Richardson's confession. Ladwig was the State's negotiator while the defendant was negotiating for himself. The "tenor of the conversation" between Ladwig and Richardson leads to no other conclusion. Robertson, 582 F.2d at 1367.
*1355 As in Roberts, there is also no basis to conclude here that the negotiations ceased when the defendant provided the police with the single thing they consistently asked for in the negotiations, i.e., the defendant's statement.[11] Ladwig stated in his numerous contemporaneous police reports that Richardson was repeatedly told that the State would negotiate with him if he would give a statement. For example, Ladwig testified:
Q Okay. Do you have that November 5th, 1991, report you made on that visit?
A Yes, I do.
Q Okay. What did you mean by the statement to Mr. Richardson that "prior to any signed agreement between him and the state, Richardson would have to provide a full confession to the Carolyn Lee case"? What did you mean by that, Detective Ladwig?
A I think I meant that I wanted him to confess to me if he did it before we went any further in any negotiations.
Further, in describing a subsequent meeting Ladwig testified:
Q Detective Ladwig, what did you mean by this statement when you said: I advised Larry that if he still wished to confess to the murder of Carolyn Lee, then I would first need his true confession if, in fact, he did kill Carolyn Lee; then we would present that to the state attorney for consideration of new plea negotiations.
A I was asking Larry for a confession and if he confessedLarry asked, Well, what's in it for me?
And if he confessed, I said, Well, if you confess, then I'll tell Mr. Damore you confessed and then we'll see what can be worked out.
Q As a matter of a plea.
A Well, there was no plea offer at that time.
I told him that the plea offer that we had discussed previously was gone and that now if he wanted to talk to me, I wanted a confession from him if he did it, and he asked, Well, what's in it for me?
I said, Well, if you confess to me, I can't offer you anything, Larry, but I'll tell Damore you confessed and then we'll see what can be done with it.
Q You didn't say "for consideration of a new plea negotiation"?
A I don't know if those were my exact words, but that was the intent; that if he still wished a negotiation, that if I got a confession, that I would present it to the state attorney and then we could go from there for it.
The requirement of a statement was repeated in the written plea agreement executed by the state attorney, along with some other terms that the defendant would not accept. There is no basis on this record to conclude, as the trial judge did here, that the ongoing negotiations between Ladwig and the defendant had suddenly ceased, because Richardson was told that although he could go ahead and give a statement without signing the plea agreement, if he did so he would have "nothing". As Ladwig himself explained in the colloquy quoted above, even though "the plea offer that we had discussed previously was gone", if Richardson gave the requested statement "we'll see what can be done with it".
Rule 3.172(h) and section 90.410, Florida Statutes (1991), prohibit the admission of statements given during plea negotiations.[12] The rule and the statute do not require that a bargain be completed or that a *1356 written agreement be signed. We agree that Richardson could not receive the benefit of having the pending first-degree murder charge reduced until he executed the agreement and complied with all of its terms. By not executing the agreement he lost that opportunity, and, in Ladwig's words, he had "nothing" even though he gave the State what it sought in the negotiations.[13] But the question here is not whether the statement was given as part of a specific written agreement thereby entitling the defendant to the benefit of his bargain; rather, the question is whether the statement was given during the repeated and ongoing plea negotiations between Richardson and the government. On this record, we find that it was. Therefore, under the rule and our case law, any confession obtained under such circumstances is inadmissible at trial.[14]
Accordingly, since we conclude that Richardson's statement was improperly admitted at trial and we cannot conclude that the admission of this statement was harmless, we remand for a new trial in accord herewith. However, for the sake of judicial efficiency, we address some of the issues raised in Richardson's appeal for the benefit of the trial court on remand.

REMAINING ISSUES
First, although we find claim (6) to be procedurally barred, even if the issue was properly preserved, we have repeatedly held that the standard guilt phase reasonable doubt instruction provides a "constitutionally proper definition of reasonable doubt." Archer v. State, 673 So.2d 17, 20 (Fla.), cert. denied, ___ U.S. ___, 117 S.Ct. 197, 136 L.Ed.2d 134 (1996); Esty v. State, 642 So.2d 1074 (Fla.1994), cert. denied, 514 U.S. 1027, 115 S.Ct. 1380, 131 L.Ed.2d 234 (1995). Claim (7) is also procedurally barred and without merit since neither the claim itself nor any of the sub-claims were raised at trial and we have rejected the same challenge to Florida's death penalty statute in prior cases. See Williamson v. State, 681 So.2d 688 (Fla. 1996), ___ U.S. ___, 117 S.Ct. 1561, 137 L.Ed.2d 708 (1997); Hunter v. State, 660 So.2d 244 (Fla.1995), cert. denied, 516 U.S. 1128, 116 S.Ct. 946, 133 L.Ed.2d 871 (1996). We address the remaining issues in turn.[15]

Challenge to Venire
Richardson cites Craig v. State, 583 So.2d 1018 (Fla.1991), for the proposition that the venire from which his jury was selected represents an unconstitutional jury districting system. His claim is without merit.
*1357 In Craig, we found the jury districting system in Palm Beach County unconstitutional based on our earlier decision in Spencer v. State, 545 So.2d 1352 (Fla.1989). 583 So.2d at 1019. In Spencer, we reviewed the administrative order creating jury districts within the county, finding that:
The effect of the administrative order is that a black defendant charged with a crime in the predominantly white West Palm Beach district must be tried in that jury district, while a white defendant charged with a crime in the predominantly black western district has a choice of being tried in the predominantly white West Palm Beach district or in the predominantly black Glades district. That procedure of allowing a choice in one district but not in the other violates equal protection....
545 So.2d at 1355. We conclude that no comparable equal protection violation exists in this case.
On the contrary, Volusia County draws its potential jurors from voter registration lists, a practice approved by this Court. See Hendrix v. State, 637 So.2d 916 (Fla.1994); Bryant v. State, 386 So.2d 237 (Fla.1980). Accordingly, the trial court properly exercised its discretion in denying Richardson's challenge to the venire.

Williams Rule Evidence Appeal
Richardson argues that after the trial court found the State's Williams Rule[16] evidence regarding Kevin Floyd's murder[17] "irrelevant to prove any material issue and fact," the State impermissibly sought an appeal to the Fifth District. We disagree since we have held that the State may seek certiorari in the district courts of appeal from pretrial orders in criminal cases. State v. Pettis, 520 So.2d 250, 253 (Fla.1988).
As has been noted, "interlocutory appeals in death cases rarely involve matters that district courts do not routinely consider." Gerald Kogan & Robert Craig Waters, The Operation and Jurisdiction of the Florida Supreme Court, 18 Nova L.Rev. 1151, 1213 (1994). From that proposition, we venture that there can be no serious dispute that district courts of appeal routinely consider evidentiary issues. Furthermore, we have stated that:
The ability of the district courts of appeal to entertain state petitions for certiorari to review pretrial orders in criminal cases is important to the fair administration of criminal justice ... [since] there will be some circumstances in which the state is totally deprived of the right of appellate review of orders which effectively negate its ability to prosecute.
Pettis, 520 So.2d at 253.
At issue is Florida Rule of Appellate Procedure 9.140(c)(1)(B), which allows the State to appeal orders "suppressing before trial confessions, admissions, or evidence obtained by search and seizure." After the trial judge excluded certain evidence, the State appealed the order to the Fifth District. State v. Richardson, 621 So.2d 752 (Fla. 5th DCA 1993).[18] Of relevance to this issue, the district *1358 court concluded that the State could appeal items 3 and 6 as they were admissions within the ambit of rule 9.140(c)(1)(B). Id. at 754. The court also found that item 2, the murder of Kevin Floyd, clarified, explained, and was intertwined with Richardson's admission to his father "that he needed money to leave town because he had killed a man." Id. The court further stated that even if the Floyd murder was not appealable as a matter of right, the State could still seek review of the trial judge's exclusion of this evidence via common law certiorari under Pettis. Id. Finally, citing Pettis once more, the Fifth District granted common law certiorari to the State in order to review the exclusion of items 1, 4, and 5. Id. at 755.
After reviewing the Fifth District's decision, we find that it fully comports with our reasoning in Pettis. In Pettis, we expressed concern that:
If a nonfinal order does not involve one of the subjects enumerated in Florida Rule of Appellate Procedure 9.140(c)(1), the state would not be able to correct an erroneous and highly prejudicial ruling. Under such circumstances, the state could only proceed to trial with its ability to present the case significantly impaired.
520 So.2d at 253. The excluded items were important circumstantial evidence that, if not presented at trial, might have significantly impaired the State's prosecution of Richardson. Therefore, we conclude that the Fifth District properly heard the State's appeal of the trial court's exclusion of this evidence.[19]
Finally, contrary to Richardson's assertion, we find that the district court made rulings of law based on decisions of this Court and other district courts and did not substitute its judgment for that of the trial court on factual matters. Therefore, for the reasons stated, we find no error in the Fifth District entertaining the State's appeal on this issue. Pettis.

CONCLUSION
In summary, because we find that Richardson's statement was improperly admitted at trial and we cannot conclude that the admission of this statement was harmless, we reverse the conviction of first-degree murder and remand for a new trial in accord herewith.
It is so ordered.
KOGAN, C.J., OVERTON, SHAW and ANSTEAD, JJ., and GRIMES, Senior Justice, concur.
WELLS, J., concurs in part and dissents in part with an opinion, in which HARDING, J., concurs.
WELLS, Justice, concurring in part and dissenting in part.
I concur in the majority opinion on all issues except the reversal of the trial court's decision admitting into evidence Richardson's November 22, 1991, statement to Detective Ladwig.
A reading of the record indicates, as the trial judge specifically noted, that he reflected on this issue "at length" because of the defendant's choice to represent himself.[20] Although there had been an earlier suppression hearing before another judge prior to Ladwig's testimony at the trial which is the *1359 subject of this appeal, the trial judge heard testimony concerning the confession as a proffer and the judge himself questioned Ladwig. The judge then stated:
The testimony that's before me is from the police officer who describes his recollection as best he can of the incident and how it came to be. And it's my interpretation of that testimony that what he's saying is that there was no negotiations. I guess as a detective maybe he wasn't really in a position to negotiate a plea, anyway. But even if he were, it's undisputed at this point that he was there. The negotiations had ceased. And for some reason, perhaps known only to the accused, he decided to make an oral statement.
And it may well be he thought that that had some benefit or some relief to him. The reason for that maybe escapes me. It seemed to be the big issue as to whether it was recorded or not. Maybe the defendant didn't understand thatdidn't matter whether it was recorded or not as to whether it could be used against him.
But at any rate, it appears he knowingly made this statement of his own volition. And at this time, under the rule, I don't believe it wasand under the testimony presented, it was not a violation of four ten [section 90.410] to admit such a ruleor such a confession or statement. And so I'm going to deny the motion.
This statement by the trial judge followed a detailed hearing in which Ladwig testified as to the circumstances in which Richardson made the confession. The judge carefully questioned Ladwig regarding the statement. Ladwig's testimony was that he had brought Richardson the written plea offer signed by the state attorney and that Richardson had objected to several conditions in the agreement. Ladwig told Richardson that he had no authority to change the conditions. Then the following occurred:
THE WITNESS [Detective Ladwig]: I'm packing up. I'm getting up my stuff. I told Mr. Richardson, I'll relay this information to Mr. Damore tomorrow. I'm not doing any more tonight. I'm tired. That's when he asked me, do I have to sign this to give you a confession. I explained to him, no, you don't. But if you give me a confession without signing this, you have nothing. You have no agreement, because I'm going to take that confession and I'm going to relay that confession to the state.
I said, you understand that, don't you? He says, I understand it. He says, I'll worry about that later, but do I have to sign that to give you a confession. I said no. And I explain it to him again that if you give me a confession without signing, you've got nothing. There is nothing there and I have a confession. He said, I'll worry about that later. He said, okay, I'll give you a confession.
THE COURT: Then what did you do?
THE WITNESS: I said, if that's agreeable with you, I'll take your confession, but understanding what I just explained to him. He said, fine, I'll give you a confession. I'll worry about the rest of it later.
Following this testimony, the following colloquy occurred:
MR. DUBBELD [counsel for Richardson]: Well, is the Court comfortable that there was bargaining going on at the time of the statement?
THE COURT: No, I'm not so comfortable. This strikes me at this point based upon what's been said that this didn't occur as a result of any bargaining. For reasons, at least as expressed by this witness, the statement or the confession, if that's what it is, was made of the accused's volition. It wasn't conditioned on anything. It wasn't necessarily in keeping with the plea. In fact, there was no such agreement at the time and apparently never turned out to be one, believing this witness' testimony at this time.
MR. DUBBELD: Yes, sir.
THE COURT: You see.
MR. DUBBELD: I'm taking a different angle on it, Your Honor.
THE COURT: You think because they at some point in time talked about a plea bargain that that makes anything of this nature part of it.
MR. DUBBELD: No, sir. But they came so close that they had reduced it to writing, had Mr. Damore execute it. And *1360 it's clear that a condition precedent is that the defendant confessed and that kicks in the state's obligations.
What is apparent from these statements directly from the record is that the trial judge correctly analyzed the issue, which was whether the statement by Richardson was a part of the plea negotiation. The trial judge decided it was not. I recognize that there could be a disagreement as to the factual determination of whether the negotiations had ceased. However, the point is that if the detective's testimony is believed, Richardson confessed, and the confession was not a part of the plea negotiations. The detective clearly testified that he told Richardson that if he confessed at the time he did, the confession would not be in connection with the plea negotiation. On this point, the issue is the credibility of the detective.
It would simply be wrong to reason that Richardson could not make a voluntary confession outside of the plea negotiation during the period while plea negotiations were ongoing. Neither section 90.410, Florida Statutes, nor rule 3.172(h) should be construed to place a prophylactic around a time period simply because the State and the defendant discuss a plea during that period. The statute and the rule are obviously intended to encourage plea negotiations but should not be used as a needless impediment to a jury's consideration of a voluntary confession.
It is axiomatic that a trial court's finding in respect to a motion to suppress comes to us with a presumption of correctness. Escobar v. State, 699 So.2d 984, 987 (Fla.1997). The reason for this rule is easily seen in this case. Since the determination of the circumstances of Richardson's confession is centered upon the credibility of Ladwig, the trial judge is in a better position than we are to make that judgment since he witnessed the live testimony of Ladwig rather than reviewing the cold record.
My view is that the trial judge in this case understood the issue and made an advised judgment. It is not within this Court's province to disturb that judgment. Therefore, I would affirm the judgment and sentence in this case.
HARDING, J., concurs.
NOTES
[1] The claims are: (1) the trial court erred in allowing the medical examiner's testimony over Richardson's objection; (2) the State's prosecutorial misconduct constitutes reversible error; (3) the trial court erred in admitting Richardson's alleged confessions when those statements were made pursuant to plea negotiations; (4) the trial court erred in denying Richardson's challenge to the venire and related motions to dismiss; (5) the Fifth District Court of Appeal erred in accepting the State's appeal of the trial court's ruling on Williams rule evidence; (6) the reasonable doubt instruction deprived Richardson of due process and a fair trial; (7) section 921.141, Florida Statutes (1991), is unconstitutional; (8) the trial court erred by denying Richardson his right to self-representation; (9) the trial court erred by denying Richardson's motion to continue; and (10) the trial court erred in failing to conduct an adequate Faretta inquiry prior to Richardson's proceeding pro se during the penalty phase.
[2] On November 18, 1991, four days before his alleged confession to Ladwig, Richardson reached a plea bargain with Assistant State Attorney Carl Zollezzi. Richardson agreed to plead guilty to possession of a firearm by a convicted felon, armed robbery, and grand theft in relation to his armed robbery of Earl Bracht on February 11, 1991. State v. Richardson, 621 So.2d 752, 754 n. 5 (Fla. 5th DCA 1993).
[3] Detective Ladwig's police report indicates that his interview with Richardson lasted from 7:30 p.m. until 9 p.m. His report, dated that same day, November 22, 1991, was written immediately thereafter.
[4] Ladwig testified at trial that he did not mean Richardson had to confess before signing the plea agreement, and that he had perhaps used the wrong wording to describe his intent.
[5] He testified that he presented Richardson a waiver of counsel to sign prior to presenting the plea offer.
[6] Ladwig testified that Richardson balked at signing the agreement because the State could not guarantee that he would be transferred to the Massachusetts correctional system if he pled guilty to second-degree murder and that he also objected to the $10,000 statutory fine attached to second-degree murder. Richardson allegedly stated that he had no money to pay the fine.
[7] Judge Gayle Graziano.
[8] Judge Kim Hammond.
[9] KRE 410(4) bars the admission, in any civil or criminal proceeding, of "[a]ny statement made in the course of plea discussions with an attorney for the prosecuting authority which do not result in a plea of guilty or which result in a plea of guilty later withdrawn."
[10] At one point in the proceedings the trial judge stated:

I guess as a detective maybe he wasn't really in a position to negotiate a plea, anyway. But even if he were, it's undisputed at this point that he was there. The negotiations had ceased. And for some reason, perhaps known only to the accused, he decided to make an oral statement.
And it may well be he thought that that had some benefit or some relief to him. The reason for that maybe escapes me. It seemed to be the big issue as to whether it was recorded or not. Maybe the defendant didn't understand thatdidn't matter whether it was recorded or not as to whether it could be used against him.
But at any rate, it appears he knowingly made this statement of his own volition. And at this time, under the rule, I don't believe it wasand under the testimony presented, it was not a violation of four ten [section 90.410] to admit such a ruleor such a confession or statement. And so I'm going to deny the motion.
[11] We are not faced with a "swearing match" between witnesses testifying on opposing sides. Rather, we are dealing with the repeated and unambiguous statements of the government's agent made and recorded by him during his negotiations with the defendant. In other words, we have written contemporaneous accounts of the negotiations authored by the state's agent. Those written accounts, in fact, were expressly relied on by the agent to detail the statement sought by the state and given by the defendant at that time. In addition, we have the agent's later unrecorded recollection that he warned the defendant that he had "nothing" if he went forward and gave a statement without signing the written plea agreement. We find the so-called "warning" insufficient to transform the fundamental character of the meeting from negotiations to something else. For this reason we need not and do not consider Richardson's citation to us of Ladwig's misconduct in other cases.
[12] Rule 3.172(h) is simply a judicial restatement of the provisions of section 90.410.
[13] Interestingly enough, the "bargaining" by the State continued right up until the trial court's ruling on the admission of the statement. The State's last comment before the trial court ruled was:

MR. POLITIS [prosecutor]: Judge, one last statement. If defense counsel is articulating that his client has a deal, fine. If he wants that deal, let's do it right now. He pleads guilty to second degree murder. He's sentenced as a habitual violent offender and it's over. If he wants his cake right now, let him eat it. But if he doesn't and if he doesn't want to entertain that deal, then obviously he never did want to have a meeting of the minds.
So let's put him on the stand. Let's ask him, would you like the deal.
[14] The coercive aspect of any such representation may also render a subsequent confession inadmissible. See Traylor v. State, 596 So.2d 957, 964 (Fla.1992) (emphasizing that "[b]ecause of the tremendous weight accorded confessions by our courts and the significant potential for compulsionboth psychological and physical in obtaining such statements, a main focus of Florida confession law has always been on guarding against one thingcoercion"); see also Brewer v. State, 386 So.2d 232, 235-36 (Fla.1980) (requiring confessions excluded "if the attending circumstances, or the declarations of those present at the making of the confession, are calculated to delude the prisoner as to his true position, or to exert improper and undue influence over his mind"); Walls v. State, 580 So.2d 131 (Fla. 1991); Malone v. State, 390 So.2d 338 (Fla. 1980); Voltaire v. State, 697 So.2d 1002 (Fla. 4th DCA 1997). The question here would be whether the statement was induced by the State's promises during the plea negotiations, including those contained in the written plea agreement. We need not decide that issue.
[15] Although mooted by our reversal of Richardson's conviction and sentence, we summarily reject claims (8), (9), and (10) that Richardson was denied his constitutional right to self-representation under Faretta v. California, 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975). We strongly approve of the trial court's patient and thorough inquiries of Richardson's numerous demands for self-representation. Our review of the record confirms that the trial court bent over backwards to accord Richardson all the legal and constitutional rights he was entitled to.
[16] In Williams v. State, 110 So.2d 654, 659-60 (Fla.1959), we established the following standard for admitting similar fact evidence:

Our view of the proper rule is that relevant evidence will not be excluded merely because it relates to similar facts which point to the commission of a separate crime. The test of admissibility is relevancy. The test of inadmissibility is a lack of relevancy.
[17] Richardson was convicted of second-degree murder and possession of a firearm during the commission of a felony for the killing of Floyd on February 12, 1991. Richardson, 621 So.2d at 754 and n. 6.
[18] In dispute was the following evidence:

(1) Richardson had a firearm in his possession on February 11, 1991.
(2) Richardson murdered Kevin Floyd with a small-caliber, dark-colored handgun on February 12, 1991.
(3) Richardson called his father in Massachusetts on February 13, 1991 and told him that he needed money to leave town because he had "just killed a man."
(4) Richardson's aunt, Rosa Lane, discovered that a small-caliber, dark-colored handgun was missing from her home. She last saw the gun on January 1, 1991. Richardson had access to his aunt's home.
(5) An analysis of the bullets which killed Floyd and Lee revealed that both came from a.22 caliber firearm (probably a revolver), were consistent in class characteristics, and could have come from the same firearm.
(6) When the police contacted Richardson on February 14, 1991, following Lee's murder, Richardson stated that he was sorry he had come down to the police station; that he had been in the process of packing his bags to leave; and that, had he continued packing and left, the police would never have found him.
Richardson, 621 So.2d at 754 (footnotes omitted).
[19] As it turned out, the district court affirmed the trial court's order regarding items 1 and 4, reversed on items 2 and 3, and quashed the order as to items 5 and 6. Richardson, 621 So.2d at 758.
[20] I also point out that Richardson's argument and the trial judge's ruling were based on section 90.410, Florida Statutes (1991), not on Florida Rule of Criminal Procedure 3.172(h). However, this is of no import since the trial court found that plea-bargaining negotiations had ceased. Thus, Richardson's statement would be admissible under rule 3.172(h) as well as section 90.410, as noted.

Section 90.410, Florida Statutes (1991) provides in relevant part:
Evidence of a plea of guilty, later withdrawn; a plea of nolo contendere; or an offer to plead guilty or nolo contendere to the crime charged or any other crime is inadmissible in any civil or criminal proceeding. Evidence of statements made in connection with any of the pleas or offers is inadmissible....