CAMPBELL, Acting Chief Judge.
Appellant, Ivan Melendez, challenges his convictions for first degree murder, attempted murder, and attempted robbery. While appellant raises numerous issues on this appeal, we conclude that none of them has sufficient merit to afford him relief. We, therefore, affirm his convictions and sentences. Nevertheless, two of the is *1012 sues, each of which concerns statements appellant gave to law enforcement, deserve discussion.
Appellant’s first issue relates to statements he made shortly after he was arrested. Appellant moved to suppress the statements on the grounds that they were not made voluntarily. The trial judge, relying on Harris v. New York, 401 U.S. 222, 91 S.Ct. 643, 28 L.Ed.2d 1 (1971), agreed and suppressed the statements, but in doing so, ruled that the statements could be used to impeach appellant in the event he testified in his own behalf. The trial judge’s reliance on Harris to rule the statements could be used to impeach was in error.
While Harris holds that statements or confessions of a defendant obtained in violation of Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) may be used to impeach a defendant who testifies in his own behalf, Harris does not hold that a coerced or involuntary statement can be so used. Harris states as follows:
Petitioner makes no claim that the statements made to the police were coerced or involuntary....
* * * *
Miranda barred the prosecution from making its case with statements of an accused made while in custody prior to having or effectively waiving counsel. It does not follow from Miranda that evidence inadmissible against an accused in the prosecution’s case in chief is barred for all purposes, provided of course that the trustworthiness of the evidence satisfies legal standards.
401 U.S. at 224, 91 S.Ct. 643 (emphasis supplied). Our own supreme court has held repeatedly that before admitting the statement of a defendant for impeachment purposes when the statement has been otherwise excluded, it must first be determined that the statement was made voluntarily. See White v. State, 446 So.2d 1031 (Fla.1984); Nowlin v. State, 346 So.2d 1020 (Fla.1977).
The trial judge therefore erred when he suppressed for involuntariness appellant’s statements in the State’s case-in-chief but ruled that he would allow those same statements to be used for impeachment purposes. However, the error was harmless because appellant elected not to testify in his own behalf and the statements were never used for impeachment.
Appellant next argues that the court improperly admitted a later statement he made to law enforcement officer Agent Buissereth of the Lee County Sheriffs Office. The trial judge ruled that this later statement was admissible because it was voluntary, not made in violation of Miranda, and not inadmissible as a violation of Florida Rule of Criminal Procedure 3.172(h) and section 90.410, Florida Statutes (1995).
Appellant argues in this appeal only that this later statement was inadmissible as a violation of rule 3.172(h) and section 90.410, as having been made in connection with plea negotiations. Appellant relies on Richardson v. State, 706 So.2d 1349 (Fla.1998), which adopted the two-tiered analysis enunciated in United States v. Robertson, 582 F.2d 1356 (5th Cir.1978): “First, whether the accused exhibited an actual subjective expectation to negotiate a plea at the time of the discussion, and, second, whether the accused’s expectation was reasonable given the totality of the circumstances.”
We conclude, for several reasons, that appellant fails the first tier test of Robertson in that he has not demonstrated that he exhibited an actual subjective expectation to negotiate a plea at the time of his discussion with Agent Buissereth. Appellant testified at the hearing on his motion to suppress this statement, but did not mention any effort to negotiate a plea, nor admit to any statements he made in furtherance of any effort to negotiate a plea. Appellant testified:
*1013 Q: All right. Do you recall if Mr. Buis-sereth came to visit you at the jail?
A: Yeah, he came November — he came December 10th, I think ... He came November 10th. I was in the second floor and some officer called me and told me that my lawyer came to see me. And when I came down to the first appearance room it was Officer Buisser-eth.
Q: How long after you were arrested was it that he came and saw you?
A: About two, three days, because I got arrested November 8th, then I got the papers November 9th, and November 10th he came to see me.
They told me this was my lawyer, Frank Nivert, came to see me and he wanted to talk to me. So, I went down to the first appearance room. Mr. Buissereth was sitting down in the right hand side where the two areas are, where people go to the first appearance room.
Q: Did he ask you questions?
A: He came and asked me, he told me that he wanted to help me. He wanted to know — he asked me did I know where the gun was, and if I told him where the gun was so he can go and get it and he would help me out and make a deal with the State.
Q: Did he ever come and see you at the jail at any other time besides that?
A: That was, yeah, that was that time. Then he came again, but I didn’t talk to him, because I had told my lawyer, Frank Nivert, that he had come to see me. They told me it was him. He said, no, he said the next time when they do that just show them this paper right here.
And they did that twice to me. They say it was my lawyer, so I go to see my lawyer and it was Officer Buissereth.
Q: Did you actually see him those times?
A: Because when I went to the room I didn’t want to talk to him. They locked the door on him. I couldn’t get out. They told me I had to talk to him. I ain’t really talking to him. All he wants to know is he told me that if I know where the gun was to tell him where it was and he’s [sic] go and find it and make a deal with the State so he can help me out.
Q: Do you remember how long after that first meeting these other meetings were?
A: About five, six days.
Q: Did he ever come see you in December?
A: I don’t remember. It was actually in November, because about two or three days when I got arrested he came to see me. And then he left for vacation. He told me he was going on vacation. He was coming back. Then he came back. And he came back and asked me the same things he asked me before.
Agent Buissereth’s testimony on the other hand was as follows:
Q: Were you aware of when the grand jury issued an indictment in this case?
A: Yes.
Q: Sometime after the indictment came down did you start to receive calls from Mr. Melendez at the jail?
A: Yes.
Q: How many calls?
A: Several.
Q: Three, five, ten?
A: I’d say between five and ten.
Q: Okay. Did you take those calls originally?
A: I got the message that he called.
Q: Okay. Did you ever speak to Mr. Melendez over the phone?
A: No.
Q: You received a handful of written notes on your desk?
A: It wasn’t all at once. It was several different times.
Q: Over what kind of period of time are we talking about?
*1014 A: A couple, a week or two, maybe.
Q: Okay. When you got the first couple messages why didn’t you just go see Mr. Melendez then?
A: I wasn’t interested in talking to him.
Q: Okay. At some point your mind changed on that?
A: Yes.
Q: Why?
A: Because he kept calling.
Q: Okay. So, eventually you go over to the jail to see him?
A: Yes.
Q: All right. When you went over to see Mr. Melendez where did you talk to him?
A: The first appearance room.
Q: Okay. So, he’s obviously in custody at that point?
A: Yes.
Q: How did you start the conversation?
A: I went in, had him brought downstairs and asked him what does he want.
Q: Okay. You asked him what did he want?
A: Yes.
Q: How did respond [sic] to that question?
A: He said I need your help.
Q: Okay. Walk us through the rest of the conversation, as best you can remember.
A: I said what do you mean you need my help. He said I need you to do me a favor and talk to the State for me. I said what do you mean, to talk to the State. He said, well, he had a lawyer at the time, his attorney told him that he was looking at either life or the chair. And he said he couldn’t take that, that the gun that he had didn’t have any bullets in it, it was Flaco, if the State offered him a deal he’d take 40 years mandatory, and he’d plea to that.
Q: How did you respond to that?
A: I said I can’t help you, but I’ll call the State and tell them.
Q: Okay. Anything else in that conversation at that point?
A: No.
Q: What did you do with that information?
A: I called Bob Baisor (phonetic) in the State Attorney’s Office and told him.
Q: Just for the record, Mr. Baisor’s an investigator with the State Attorney’s Office?
A: Yes.
Q: When you had Mr. Melendez brought down to the first appearance room, before that conversation that you just related, did you make any promises to him before that?
A: No.
Q: Make any threats?
A: No, I hadn’t seen him since right after the arrest.
Q: Other than telling him that you would relay that information to the State Attorney’s Office did you make any kind of promises or guarantees to him?
A: No.
Q: Who else was in the room where you had this conversation?
A: Just the two of us.
Whichever version of this latter conversation between appellant and Agent Buis-sereth is relied upon, it is clear from both that appellant demonstrated no reasonable subjective expectation of negotiating a plea. Accepting Agent Buissereth’s statement in the manner most favorable to appellant’s position, there was nothing shown other than an unsolicited, unilateral offer made by appellant. That kind of offer and statement made in connection therewith has been held not to fall within the protection of either rule 3.172(h) or section 90.410. See Bottoson v. State, 443 So.2d 962 (Fla.1983), cited with approval in Richardson, 706 So.2d at 1353.
*1015 Finding no reversible error, we affirm appellant’s convictions and sentences.
GREEN and DAVIS, JJ., Concur.