843 So.2d 962 (2003)
The STATE of Florida, Petitioner,
v.
Xavier RICHARDS, Respondent.
No. 3D02-572.
District Court of Appeal of Florida, Third District.
April 23, 2003.
*963 Robert A. Butterworth, Attorney General, and Steven R. Berger, Assistant Attorney General, for petitioner.
Bennett H. Brummer, Public Defender, and Robert Godfrey, Assistant Public Defender, for respondent.
Before COPE and LEVY, JJ., and NESBITT, Senior Judge.

On Rehearing Denied
COPE, J.
On consideration of the respondent's motion for rehearing, we withdraw the court's previous opinion and substitute the following opinion.
The State petitions for a writ of certiorari, seeking to quash an order which limits the State's ability to impeach State witness Shawanna Glenn. The petition challenges the trial court's interpretation of Morton v. State, 689 So.2d 259 (Fla.1997), receded from in part on other grounds, Rodriguez v. State, 753 So.2d 29 (Fla.2000). We conclude that the petition is well taken and grant it.

I.
Defendant-respondent Xavier Richards is charged with the first degree murder of *964 Floyd Williams. Ms. Glenn is the defendant's girlfriend.
The victim was still alive when the police arrived at the scene. He told the police that Ms. Glenn and the defendant had robbed him and the defendant shot him.
Ms. Glenn was interviewed shortly after the shooting. She initially denied any knowledge of the shooting. She stated that during the evening, she and the defendant had quarreled over the defendant's losing his job. She and the defendant walked to a nearby club. The defendant stayed outside and Ms. Glenn went inside.
Ms. Glenn said that inside the club, she had drinks and played pool with the victim, Floyd Williams. After two hours, Ms. Glenn looked outside the club and saw that the defendant was no longer there. She and the victim then walked toward her house. A short distance from her house, she and the victim separated and she went home alone. The shooting of the victim took place shortly after that.
At the police station, a computer voice stress analyzer (CVSA) test was administered to Ms. Glenn. It showed that she was not being truthful. The detective told her this and told her he thought that she was covering up for the defendant.
Ms. Glenn then stated that the defendant had admitted to her that he shot the victim. She said this occurred in a cell phone call from the defendant shortly after the shooting, in which the defendant asked her to come pick him up but she refused to do so. Ms. Glenn's cell phone records confirmed that she received several telephone calls from a pay telephone at the relevant time.
Ms. Glenn then gave the police a tape-recorded statement. This was played back for her and she acknowledged that the statement was correct.
Two months later, Ms. Glenn was interviewed by the new lead detective on the case. Ms. Glenn told the new detective that her statement was correct except for the part about receiving the incriminating phone call from the defendant. She maintained that she had been threatened by the original detective and had made up that part of the statement. She told the defendant's counsel the same thing.
The defendant moved to suppress Ms. Glenn's statement entirely. The defense contended that the original detective had threatened to charge Ms. Glenn with murder if she did not give a statement implicating the defendant. The trial court conducted an evidentiary hearing at which Ms. Glenn and both detectives testified. At the conclusion of the hearing the trial court found that Ms. Glenn's statement was voluntary and denied the request to suppress it.
The defense then argued alternatively that under Morton, it would be impermissible for the State to ask Ms. Glenn at trial about the telephone call she had received from the defendant. Since she had recanted that part of her statement, the only reason to ask her about the recanted statement would be for purposes of impeachment. The defense contended that under Morton, it would be impermissible to place the contents of the defendant's telephone call before the jury.
The trial court granted the motion, and the State has petitioned for a writ of certiorari.

II.
The trial court and the parties acknowledge that Ms. Glenn is being called for legitimate forensic purposes by the State in this case. Ms. Glenn's testimony places the defendant in proximity to Ms. Glenn and the victim throughout the evening *965 of the crime. Her testimony also supplies a possible motive for the shooting.
She has, however, recanted the part of her statement where she said that the defendant called her and admitted shooting the victim. Under the Evidence Code, a party is allowed to impeach its own witness. § 90.608, Fla. Stat. (2001). Standing alone, this provision would allow the State to impeach Ms. Glenn with her prior inconsistent statement to the detective that the defendant admitted committing the murder.
The Florida Supreme Court through case law has placed a limitation on the ability of a party to impeach its own witness where, as here, there has been a recantation. Morton, 689 So.2d at 262-63. The Morton rule prohibits the calling of a witness if the sole or primary purpose is to impeach that witness. Id. at 263-64; Charles W. Ehrhardt, Florida Evidence § 608.2, at 459-61 (2002). The Morton court said:
Obviously, no single rule can be delineated to cover all of the circumstances under which parties will seek to impeach their own witnesses. Generally, however, if a party knowingly calls a witness for the primary purpose of introducing a prior statement which otherwise would be inadmissible, impeachment should ordinarily be excluded. On the other hand, a party may always impeach its witness if the witness gives affirmatively harmful testimony. In a case where a witness gives both favorable and unfavorable testimony, the party calling the witness should usually be permitted to impeach the witness with a prior inconsistent statement. Of course, the statement should be truly inconsistent, and caution should be exercised in permitting impeachment of a witness who has given favorable testimony but simply fails to recall every detail unless the witness appears to be fabricating. In addressing these issues, trial judges must have broad discretion in determining whether the probative value of the evidence is substantially outweighed by the danger of unfair prejudice or confusion.
Morton, 689 So.2d at 264 (emphasis added). The Morton decision is based on federal authority on this issue. Id. at 262-64.
The principles applicable here have been summarized by McCormick on Evidence as follows:
There is some dispute whether and under what circumstances impeachment of one's own witness is impermissible because of prejudice to the opposing party, particularly in criminal cases. It has been widely held that a criminal prosecutor may not employ a prior inconsistent statement to impeach a witness as a "mere subterfuge" or for the "primary purpose" of placing before the jury substantive evidence which is otherwise inadmissible. Application of the "mere subterfuge" or "primary purpose" doctrine focuses on the content of the witness's testimony as a whole. If the witness's testimony is useful to establish any fact of consequence significant in the contest of the litigation, the witness may be impeached by means of a prior inconsistent statement as to any other matter testified to. In the words of one commentator, the pivotal question is whether the "party [is] calling a witness with the reasonable expectation that the witness will testify [to] something helpful to the party's case aside from the prior inconsistent statement." While the power to attack the character of one's own witness may often be of little value to the attacker, subject to the foregoing limitation, a rule against *966 showing prior inconsistent statements of one's own witness to aid in evaluating the witness's testimony is a serious obstruction to the ascertainment of truth, even in criminal cases. A criminal defendant could even urge that forbidding him from attacking a defense witness is unconstitutional in particular instances.
1 McCormick on Evidence § 38, at 142-43 (John W. Strong ed., 5th ed.1999) (some emphasis in original; some emphasis added; footnotes omitted).
As applied in this case, the question is whether there is a legitimate forensic purpose for calling Ms. Glenn as a witness to testify at trial. The judge and the parties agree that there is such a purpose in this case, and that Ms. Glenn is not being called for the sole or primary purpose of putting impeachment evidence before the jury. Since that is so, Ms. Glenn falls within the general rule that "the party calling the witness should usually be permitted to impeach the witness with a prior inconsistent statement." Morton, 689 So.2d at 264.[1]
The defense argues that the better solution to this problem is to forbid any reference to the recanted testimony where, as here, the recanted testimony can readily be separated from the rest of the same witness's testimony. The defense points out that Maryland follows such an approach. Bradley v. State, 333 Md. 593, 636 A.2d 999 (1994). The Maryland court acknowledged, however, that its approach represents the minority rule and, indeed, appears to be followed by Maryland alone. The majority rule is as stated in Morton and McCormick. Florida has aligned itself with the majority rule.
As stated in McCormick, where the witness' current testimony was preceded by other, differing accounts, it advances the search for truth that the jury hear not only the witness' current version of events but the earlier versions as well. It is inadvisable to allow a witness to edit his or her testimony by recanting parts of it before taking the stand, and then prohibiting questioning about the recantation.

III.
The State argues that Ms. Glenn's original statement that the defendant's telephone statement that he shot the victim should be admissible as a statement by Ms. Glenn "of identification of a person made after perceiving the person." § 90.801(2)(c), Fla. Stat. (2001).
During Ms. Glenn's original interview with the detective at the police station, the detective prepared a photo lineup containing the defendant and other men. At the conclusion of the tape-recorded interview, the following occurred:
Q: Okay, I'm gonna show you some pictures in a line-up, I showed you these same pictures earlier. It's a line-up consisting of six black males, numbered one through six, do you recognize any of these black males, and if so, would you point out the number or call out the number and say who he is.
A: Number three, Xavier Richards.
Q: Okay, and that is the individual who's your boyfriend named Zay? Is that a yes?

*967 A: Yes.
Q: And he's the individual who ah ... told you he shot Doc?
A: Yes.
App. 86.
The State points out that in general, identifications from a photo lineup are admissible as substantive evidence under paragraph 90.801(2)(c), Florida Statutes. See Ehrhardt, Florida Evidence § 801.9.
This provision frequently comes into play in criminal cases in which a witness has seen the perpetrator of a crime and later makes an identification from the photo lineup. The police officer who conducted the photo lineup may testify to the identification by the witness and this comes in as substantive evidence under paragraph 90.801(2)(c).
In this case, Ms. Glenn told the original detective at the police station that the defendant had telephoned her and admitted shooting the victim. Certainly "perceiving" a person under paragraph 90.801(2)(c) may occur through a voice identification. Thus, identifying a person as a telephone caller by voice identification would qualify as a statement of "identification of a person made after perceiving the person." Id. Similarly, making a visual identification of the defendant in a photo lineup is a statement of "identification of a person made after perceiving the person." Id.
What the State is trying to bring in through the detective, however, is Ms. Glenn's statement to the detective that the defendant admitted shooting the victim.[2] The substance of the defendant's statement to Ms. Glenn goes beyond being a statement of identification for purposes of paragraph 90.801(2)(c). We therefore reject the State's 90.801(2)(c) argument.

IV.
The defendant argues that even if the trial court was in error, this error is not of sufficient magnitude to justify the exercise of this court's certiorari jurisdiction. We have carefully considered this argument, but are satisfied that the standard for certiorari has been met.
We find instructive the Florida Supreme Court's opinion in Richardson v. State, 706 So.2d 1349 (Fla.1998). In that case, Richardson appealed his conviction for first degree murder of Carrie Lee. During the pendency of that case in the trial court, the trial court had entered an order precluding the State from introducing certain Williams Rule evidence regarding the murder of another victim, Kevin Floyd, on the previous day. Id. at 1357 (citing Williams v. State, 110 So.2d 654, 659-60 (Fla.1959)). The State sought review in the Fifth District Court of Appeal via a petition for writ of certiorari and a non-final state appeal. The Fifth District reversed in part and granted certiorari in part, ruling that four of the six excluded items should be admitted into evidence. 706 So.2d at 1357-58 & n. 19.
On appeal from his subsequent conviction, Richardson argued that the Fifth District had been without jurisdiction in the matter. Id. at 1357. Rejecting this contention, the Florida Supreme Court said:
Richardson argues that after the trial court found the State's Williams Rule evidence regarding Kevin Floyd's murder *968 "irrelevant to prove any material issue and fact," the State impermissibly sought an appeal to the Fifth District. We disagree since we have held that the State may seek certiorari in the district courts of appeal from pretrial orders in criminal cases, State v. Pettis, 520 So.2d 250, 253 (Fla.1988).
As has been noted, "interlocutory appeals in death cases rarely involve matters that district courts do not routinely consider." Gerald Kogan & Robert Craig Waters, The Operation and Jurisdiction of the Florida Supreme Court, 18 Nova L.Rev. 1151, 1213 (1994). From that proposition, we venture that there can be no serious dispute that district courts of appeal routinely consider evidentiary issues. Furthermore, we have stated that:
The ability of the district courts of appeal to entertain state petitions for certiorari to review pretrial orders in criminal cases is important to the fair administration of criminal justice ... [since] there will be some circumstances in which the state is totally deprived of the right of appellate review of orders which effectively negate its ability to prosecute.
Pettis, 520 So.2d at 253.
. . . .
After reviewing the Fifth District's decision, we find that it fully comports with our reasoning in Pettis. In Pettis, we expressed concern that:
If a nonfinal order does not involve one of the subjects enumerated in Florida Rule of Appellate Procedure 9.140(c)(1), the state would not be able to correct an erroneous and highly prejudicial ruling. Under such circumstances, the state could only proceed to trial with its ability to present the case significantly impaired.
520 So.2d at 253. The excluded items were important circumstantial evidence that, if not presented at trial, might have significantly impaired the State's prosecution of Richardson. Therefore, we conclude that the Fifth District properly heard the State's appeal of the trial court's exclusion of this evidence.
706 So.2d at 1357-58 (emphasis added).
Based on Richardson and the authorities cited therein, we conclude that the exercise of certiorari jurisdiction is appropriate here. Because the trial court order in this case was at odds with the terms of the Morton decision, a controlling decision of the Florida Supreme Court, it represented a departure from the essential requirements of law. Further, as recited in Richardson, the excluded matter is important evidence "that, if not presented at trial, might have significantly impaired the State's prosecution of [the defendant]." 706 So.2d at 1358. Finally, since the State has no appellate remedy if there is an acquittal of the defendant, the State does not have an adequate remedy by way of appeal. See also State v. Brea, 530 So.2d 924, 926 (Fla.1988) (if order suppressing statements of acquitted co-conspirator could not be appealed under Florida Rule of Appellate Procedure 9.140(c)(1)(B), "the State would not be precluded from seeking common law certiorari review."); State v. Bradford, 658 So.2d 572, 573-74 (Fla. 5th DCA 1995) (certiorari appropriate to review order excluding evidence which would rebut defendant's explanation of how his fingerprints came to be in the murder victim's car).

V.
For the reasons stated, we grant the petition for writ of certiorari, and quash the order now before us.
*969 Petition granted.[3]
NOTES
[1] The Morton decision adds the caveat that section 90.403 analysis is available in an appropriate case. ("In addressing these issues, trial judges must have broad discretion in determining whether the probative value of the evidence is substantially outweighed by the danger of unfair prejudice or confusion." 689 So.2d at 264). No such issue has been raised here, and we express no view, one way or the other, on whether section 90.403 has any application to the proposed testimony in this case.
[2] The defendant's statement to Ms. Glenn that he shot the victim is admissible against the defendant as an admission, if Ms. Glenn so testifies. § 90.803(18), Fla. Stat. (2001). Ms. Glenn's repeating of that statement to the detective is hearsay when testified to by the detective, unless admissible for impeachment purposes or under an applicable hearsay exception. See § 90.805, Fla. Stat.
[3] In view of this revised opinion, the defendant's motion for rehearing is denied.