880 So.2d 730 (2004)
Denesiz Letroy SMITH, Appellant,
v.
STATE of Florida, Appellee.
No. 2D02-4844.
District Court of Appeal of Florida, Second District.
May 28, 2004.
Rehearing Denied July 9, 2004.
*732 James Marion Moorman, Public Defender, and Siobhan Helene Shea, Special Assistant Public Defender, Bartow, for Appellant.
Charles J. Crist, Jr., Attorney General, Tallahassee, and Cerese Crawford Taylor, Assistant Attorney General, Tampa, for Appellee.
WALLACE, Judge.
Denesiz Letroy Smith appeals his convictions and sentences for manslaughter with a firearm and shooting into an occupied vehicle. During Smith's trial, the State experienced the serial mutiny of its three primary witnesses when they each repudiated their prior out-of-court statements accusing Smith of committing the crimes charged. The State responded by asking the investigating detective to play for the jury the witnesses' prior inconsistent statements that he had tape recorded. Over timely defense objections, the trial court permitted the State to play the tape-recorded statements in their entirety for the jury. The audiotapes were not admissible into evidence in their entirety either as nonhearsay or under any exception to the hearsay rule. Nevertheless, the trial court admitted them as substantive evidence and not for the limited purpose of impeachment. The trial court's ruling constituted error that was not harmless under the circumstances of this case. Therefore, we reverse Smith's convictions and sentences and remand for a new trial.

The Facts
The victim of the alleged homicide was Timmie Ray Mabry, a Fort Myers businessman. At Smith's trial, one of Mabry's friends testified that he had last seen Mabry on the night of November 17, 2000, when the two men left a night club together and drove away in different directions. The following afternoon, Mabry's fiancée reported him missing after he did not return home. Mabry's whereabouts remained unknown for over a week, and his unexplained disappearance received significant media attention. Ultimately, a $20,000 reward was offered in connection with the case.
On November 26, 2000, pursuant to an informant's tip, Lee County sheriff's deputies located Mabry's pickup truck in neighboring Hendry County. The truck had been submerged in a canal for several days. The truck was removed from the canal, and a body subsequently identified from dental records as Mabry's was recovered from the vehicle. After an autopsy, the medical examiner determined that Mabry had died as a result of two separate gunshot wounds to the head. The medical examiner testified at trial that Mabry's wounds were consistent with his having been shot from behind with a shotgun while he was sitting in a vehicle.
The evidence at trial strongly suggested that Mabry was shot during a visit he made to the Charleston Park neighborhood in the early morning hours of November 18, 2000. Charleston Park is a small rural community located on State Road 80 near Alva in northeastern Lee County, approximately one mile from the *733 Hendry County line. Jeff Brown, a detective with the Lee County Sheriff's Office, testified that rumors about Mabry's death were widespread in the Charleston Park neighborhood following the shooting, including reports that Smith was the perpetrator of the homicide. On the day after Mabry's truck was discovered, Smith appeared at a Lee County sheriff's substation office because he had heard that Detective Brown wanted to speak with him. Detective Brown interviewed Smith at length, and Smith denied any involvement in Mabry's death. Although Smith was permitted to leave at the conclusion of the interview, he was arrested later and charged with second-degree murder with a firearm and shooting into an occupied vehicle. On January 3, 2001, after Smith's arrest, Detective Brown conducted another lengthy interview with him. During the second interrogation, Smith once again steadfastly denied involvement in Mabry's death.
At trial, the manner of Mabry's death was not in dispute. Ample testimony and physical evidence supported the State's theory that Mabry had been killed by a shotgun blast fired from behind while he was sitting in his pickup truck. When Mabry's pickup truck was removed from the canal, a detective noted that parts of the driver's side mirror and a plastic wind deflector on the window frame were missing from the vehicle. The missing vehicle parts were subsequently recovered at the location in Charleston Park where the State contended the shooting had occurred, linking Mabry's vehicle to the scene of the homicide. However, the shotgun used to kill Mabry was never recovered. Moreover, the State did not develop any physical evidence linking Smith to Mabry's death.
At trial, the State called several witnesses who were in Charleston Park when the incident occurred. The first such witness was Mae Kafus, a Charleston Park resident, who testified that she was familiar with Smith's voice and appearance. In the early morning hours of November 18, 2000, Mae Kafus' children awakened her and told her someone had been killed. Mae Kafus got out of bed and went to her porch where she heard a voice that she thought was Smith's exclaim, "Oh, Lord, I killed somebody." Mae Kafus was careful to point out that her perception and recollection of what she had heard might have been adversely affected by the effects of medication and stress. She also conceded on cross-examination that she was not sure that the voice she heard belonged to Smith.
Next, the State called Betty Jean Smith, a Charleston Park resident unrelated to Smith, who testified that she had known Smith for years and considered him a friend. Betty Jean Smith was awakened in the early morning hours of November 18, 2000, by the sound of two shotgun blasts. She also heard someone running and peered out of her window. In the bushes in front of her house, she saw a pickup truck fitting the description of Mabry's vehicle. Five minutes after the shotgun blasts, Betty Jean Smith saw an African American man with dreadlocks back the truck out of the bushes and drive it away. Although Betty Jean Smith acknowledged that Smith was an African American man who wore his hair in dreadlocks when the incident occurred, she insisted that the man she saw in the truck was not Smith because the man she saw had a darker complexion and longer dreadlocks than Smith. On further examination, Betty Jean Smith admitted that she did not get a very good look at the person in the truck, but she maintained her claim that the person she saw driving Mabry's truck was not Smith.
*734 The State also presented the testimony of Katrina Thomasanother Charleston Park resident and Mae Kafus' adult daughter. Thomas testified that she and her brother, Jason Kafus (Mae Kafus' son), were among a number of people from the neighborhood standing outside in the early morning hours of November 18, 2000. She also stated that she saw Smith and two other men approach the truck. Then Thomas heard a single gunshot and saw the truck drive off into some bushes. Thomas testified that she did not see Smith or either of the other two men with a gun, and she did not know from what direction the gunshot had come. Thomas also testified that she did not hear Smith make any incriminating statements after the incident. In addition to Smith and the two men who approached the truck, Thomas observed about six other people in the area.
Following the testimony of Mae Kafus, Betty Jean Smith, and Katrina Thomas, the State called three additional witnesses Chad Moreland, Iris Moreland, and Jason Kafus (the "recanting witnesses"). The two prosecutors who were trying the case for the State had obviously anticipated before trial that the testimony of these three additional witnesses would be critical to the State's case against Smith. Prior to trial, each of the recanting witnesses had given tape-recorded statements to Detective Brown in which they implicated Smith in the shooting of Mabry. At trial, to the apparent surprise and consternation of the prosecutors, the State's witnesses proved to be completely uncooperative.
Chad Moreland testified that he had been standing outside near Smith when Mabry drove up in his truck. Nevertheless, Moreland denied that Smith had approached the truck. Moreland also said that he had not seen Smith with any weapons that night and denied hearing Smith make any incriminating statements. The prosecutor tried repeatedly to refresh Moreland's recollection with his prior recorded statement. Moreland, whose memory was not refreshed, responded to these attempts at one point: "Man, forget the sworn statement."
The State's next witness was Chad Moreland's sister, Iris Moreland. Iris denied giving a statement to Detective Brown and denied ever being questioned by detectives about Mabry's death. Iris also denied being present at the scene of the shooting, claiming that she was home when the incident occurred.
When Jason Kafus was called to the stand, he testified that he was not at the scene in Charleston Park when the shooting occurred. Jason also testified that he could not recall giving a statement to Detective Brown. When offered an opportunity to review a copy of his statement to refresh his recollection, Jason declined, stating that he did not want to look through it because he did not remember it at all.
Following the failure of the State's efforts to obtain the expected testimony from its three major witnesses, the State called Detective Brown to the stand. Detective Brown had been assigned as the lead investigator in the case after it became apparent that Mabry's disappearance was the result of foul play. Detective Brown questioned and obtained statements from a number of people in the case, including the recanting witnesses and Smith. Detective Brown identified audiotapes that contained interviews with Smith that had been conducted on November 27, 2000, and January 3, 2001. Over defense objections, these audiotapes were played in their entirety for the jury. In his tape-recorded interviews with Detective Brown, Smith denied any involvement in the shooting of *735 Mabry and said that he was at his girlfriend's house at the time the incident occurred.
The State also sought to play for the jury the tape-recorded statements of the recanting witnesses as substantive evidence under the "recorded recollection" exception to the hearsay rule. § 90.803(5), Fla. Stat. (2002). Smith's attorneys objected on the ground that the State had failed to satisfy the requirements of the recorded recollection exception. After hearing extensive arguments on the evidentiary question, the circuit court overruled the defense objection and allowed the State to play the audiotapes for the jury as substantive evidence under the recorded recollection exception to the hearsay rule.
Following this ruling, Detective Brown identified the tape-recorded statements, and each statement was played in its entirety for the jury. Although the details of the statements varied, the recanting witnesses each stated in their interviews with Detective Brown that they had been at the scene in Charleston Park when the incident occurred. Chad Moreland and Jason Kafus told Detective Brown that they had seen Smith fire the gun. Although Iris Moreland did not report seeing Smith fire the weapon, she did say that after she heard the gunshots,[1] she saw Smith running with a gun in his hands. All three of the recanting witnesses said they heard Smith say that he had shot someone. In her interview, Iris Moreland quoted Smith as exclaiming repeatedly after the shooting, "I killed that cracker. I killed that cracker." After the various audiotapes had been played and Detective Brown's testimony completed, the State rested its case.
Smith took the stand in his own defense and testified that he was asleep at his girlfriend's home when the shooting occurred. His girlfriend, Lattisa Perry, corroborated Smith's alibi.
The jury found Smith guilty of the lesser included offense of manslaughter with a firearm and guilty as charged of shooting into an occupied vehicle. The trial court imposed consecutive sentences of thirty years' and fifteen years' imprisonment, respectively, for the offenses.

Analysis
Of the three issues Smith raises in this appeal, only one merits discussion. Smith contends that the trial court committed reversible error in admitting into evidence the tape-recorded statements of the recanting witnesses. At the outset, we note that upon laying a proper foundation, the State might have offered such portions of the tape-recorded statements as might have been appropriate for the purpose of impeaching the recanting witnesses. See §§ 90.608(1), 90.614; Brumbley v. State, 453 So.2d 381, 384-85 (Fla.1984). If the State had successfully used the tape-recorded statements for impeachment purposes, Smith would have been entitled to a limiting instruction to the jury that the three recanting witnesses' prior inconsistent statements were relevant only to the issue of their credibility and not as substantive evidence. See Ivery v. State, 548 So.2d 887, 888 (Fla. 2d DCA 1989). "A witness's prior inconsistent statement to a police officer cannot be used as substantive evidence." Id. (citing State v. Delgado-Santos, 497 So.2d 1199 (Fla.1986)). However, in Smith's case, the State requested and the trial court allowed the introduction of the three tape-recorded statements in *736 their entirety as substantive evidence and not for the limited purpose of impeachment.

Recorded Recollection
Over timely defense objection, the trial court allowed the State to play the audiotapes during the testimony of Detective Brown on the theory that they were admissible into evidence as recorded recollection. This exception to the hearsay rule, set forth in section 90.803(5), provides as follows:
RECORDED RECOLLECTION.A memorandum or record concerning a matter about which a witness once had knowledge, but now has insufficient recollection to enable the witness to testify fully and accurately, shown to have been made by the witness when the matter was fresh in the witness's memory and to reflect that knowledge correctly. A party may read into evidence a memorandum or record when it is admitted, but no such memorandum or record is admissible as an exhibit unless offered by an adverse party.
See generally Charles W. Ehrhardt, Florida Evidence § 803.5 (2003 ed.). Subject to the laying of a proper foundation, a tape-recorded statement may qualify as a recorded recollection. See Montano v. State, 846 So.2d 677, 680-81 (Fla. 4th DCA 2003). Nevertheless, in Smith's case, the State failed to establish two critical threshold requirements of the recorded recollection exception.
First, the recanting witnesses did not testify that they had given the tape-recorded statements and that they accurately reflected their memory of events at the time they were made. Each of the recanting witnesses testified that they either did not remember giving a statement or that they had not given a statement at all. In order for a memorandum or record to qualify as recorded recollection, the witness must testify that he made an accurate record of the fact or event or that he is confident that the facts would not have been written unless they were true. See Middleton v. State, 426 So.2d 548, 551-52 (Fla.1982); Kimbrough v. State, 846 So.2d 540, 544 (Fla. 4th DCA 2003).
The facts in Kimbrough are remarkably similar to the facts in this case. In Kimbrough, an accomplice gave a tape-recorded statement to detectives that implicated the defendant in the crimes charged. When the accomplice was called to the stand, he testified that he did not remember giving a taped confession to the detectives. When a portion of the tape was played, the accomplice claimed that he did not recognize his voice on the tape. The State then called a detective to the stand to identify the accomplice's voice. The trial court admitted the tape as substantive evidence on the basis of recorded recollection, and the tape was played for the jury. Id. at 542.
On appeal, the Fourth District reversed. Noting the dearth of authority in Florida concerning the admissibility of recorded recollections as an exception to the hearsay rule, the court examined two cases from other jurisdictions. In each of these cases, a witness had given a pretrial statement implicating the defendant in the crime but repudiated the statement when called to testify at trial. The Fourth District quoted at length from Ringgold v. State, 34 Md.App. 286, 367 A.2d 35, 38-39 (1976), in which the Maryland court said:
An early discussion of the rules of evidence governing past recollection recorded is found in Martin v. Good, 14 Md. 398, 410 (1859), quoting from 1 Greenleaf, Evidence, sec. 437:
Where the writing neither is recognized by the witness as one which *737 he remembers to have seen before, nor awakens his memory to the recollection of any thing contained in it, but nevertheless, knowing the writing to be genuine, his mind is so convinced that he is, on that ground, enabled to swear positively to the fact, the testimony will be received. The examples put show the reasonableness of the doctrine, and that the ends of justice require it to be so. A more recent author, whose conclusions, we think, are generally sustained by the authorities, states the English doctrine substantially in the same way. Powel on Evidence, 308, in 96 Law. Lib., 119. Here the witness stated, that from the paper being in his own handwriting, he had no doubt it did contain the true terms of the agreement made in his presence, and upon cross-examination he gave, in effect, the same testimony.
....
The crux of this case, however, is that the past recollection recorded if it is to be admitted into evidence must be offered by the witness who is either devoid of a present recollection or possessed of an imperfect present recollection and desires to use a memorandum of a past recollection. The witness must be able to assert now that the record correctly represented his knowledge and recollection at the time of making. 3 J. Wigmore, Evidence ss 734, 746(2) (Chadbourne rev.1970).
In each of the cases we have cited it is the witness who verified the genuineness and accuracy of the facts recited in the memorandum. When the recollection of a witness is not refreshed by reference to the memorandum, but he recalls the memorandum and recalls that it was accurate when made or he recognizes the signature on the statement as his and testifies positively that he would not have signed the statement had he not believed it to be true at the time, he may testify from the memorandum or it may be received into evidence in connection with his direct examination or in cross-examination. 82 A.L.R.2d 473 (1962). In this case, however, the witness professed to have no recollection of the statements allegedly made by her to the officer. While it seems clear that this was a deliberate prevarication by the witness, there still was no adequate foundation upon which the statement could be admitted into evidence as past recollection recorded.
(Emphasis supplied; internal quotation marks omitted.) Because the witness in Ringgold claimed to have no recollection of the statements allegedly made by her to the officer, the Maryland court held that the prosecution had failed to establish an adequate foundation upon which the statement could be admitted as past recollection recorded. 367 A.2d at 39.
In Lindley v. State, 728 So.2d 1153 (Ala.1998), when the witness was called to testify at trial concerning his prior statement, he claimed to have been drunk on the date listed on the statement and for several days before. He also testified that he had no memory of the events described in the statement, that he did not remember the statement, and that he did not remember talking to the investigating officer. Quoting from the Ringgold case, the Alabama court held that because the witness did not testify at trial that he personally observed the facts referred to in the statement or that at the time the statement was made he knew of its contents and knew them to be true, the prosecution had failed to lay a foundation to admit the statement as past recollection recorded. Id. at 1155-56.
*738 In Kimbrough, the Fourth District concluded: "In this case, as in Ringgold and Lindley, Ashley [the accomplice] could not testify either that the statement was his or that it was accurate. Although he most likely developed `convenient amnesia,' the state could not establish the proper predicate for admission of the statement." Kimbrough, 846 So.2d at 544. The Fourth District recently followed Kimbrough in another decision involving similar facts. Montano, 846 So.2d at 681-82. In Smith's case, as in Kimbrough and Montano, the State failed to lay a foundation for the admission of the tape-recorded statements as recorded recollection because the recanting witnesses either could not remember or denied making the statements.
Second, the State failed to establish another critical threshold requirement of the recorded recollection exception because the State failed to show that the witnesses had an insufficient recollection of the events on the night of the shooting to enable them to testify fully and accurately. The recorded recollection exception requires that the witness have a present loss of memory concerning a matter about which the witness once had knowledge but now cannot adequately remember. See Stambor v. One Hundred Seventy-Second Collins Corp., 465 So.2d 1296, 1298 n. 2 (Fla. 3d DCA 1985) (noting that accident report was not admissible under recorded recollection exception where the restaurant manager who prepared it had a complete recall of the events that the report recorded). Before the adoption of the evidence code, Florida decisions approving "past recollection recorded" evidence emphasized that the witness "had no present recollection" independent of the record. E.g., Smith v. Hinkley, 98 Fla. 132, 123 So. 564, 566 (1929); Montgomery Ward & Co. v. Rosenquist, 112 So.2d 885, 887 (Fla. 2d DCA 1959). Presently, under section 90.803(5), a sufficient foundation may be shown if the witness merely "now has insufficient recollection to enable the witness to testify fully and accurately." See Golden v. State, 429 So.2d 45, 52 n. 4 (Fla. 1st DCA 1983).
In Smith's case, the State did not establish that the witnesses were unable to remember the night of the incident. The trial court erroneously relied on the claimed inability of the witnesses to remember giving their statements in order to allow the audiotapes to be played as recorded recollection. The trial court directed its focus on the recanting witnesses' memory loss to the wrong time period. Since none of the witnesses were shown to be unable to remember the events of the night in question, the statements were not admissible as recorded recollection.
Because the State failed to lay a proper foundation for admissibility, the trial court erred in concluding that the recanting witnesses' tape-recorded statements could be played for the jury as recorded recollection. However, the State advances other arguments in support of the admissibility of the tape-recorded statements, which we will examine next.

Statement of Identification
During the course of their lengthy tape-recorded interviews conducted by Detective Brown, each of the three recanting witnesses implicated Smith by name in the shooting of Mabry. Near the conclusion of each interview, Detective Brown asked the witness to select from a photopack the photograph of the person they had already named as the perpetrator. Each of the recanting witnesses selected a photograph of a person they referred to as "Troy." Smith's nickname is Troy.
At trial, one of the prosecutors suggested that the statements were admissible as nonhearsay evidence under the alternative *739 theory of "statements of identification" pursuant to section 90.801(2)(c). Then the following exchange occurred between the trial judge and the prosecutor:
THE COURT: Is that contained within those statements?
MR. DiPLACIDO [the prosecutor]: It is contained within the statements.
THE COURT: That might be additional grounds. But if they're coming under 802, you want to offer that as an additional basis, I don't know, maybe the fall-back position or something, you know, go ahead. But if they are admissible as recollection recorded, then the entire statement's admissible.
MR. DiPLACIDO: Okay, I'll do it that way then.
This exchange reveals that both the trial judge and the prosecutor realized that even if the small segments of the tape-recorded statements containing the photopack identifications could be played for the jury as statements of identification pursuant to section 90.801(2)(c), this would not render the balance of the tape-recorded statements admissible into evidence. Because the State's trial strategy was to play the tape-recorded statements in their entirety for the jury, the prosecutor promptly abandoned the statement of identification theory and embraced the recorded recollection rationale, declaring, "Okay, I'll do it that way then." On appeal, the State now argues that the tape-recorded statements were properly played for the jury as statements of identification.
Section 90.801 provides, in pertinent part:
(2) A statement is not hearsay if the declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement and the statement is:
....
(c) One of identification of a person made after perceiving the person.
See generally Charles W. Ehrhardt, Florida Evidence § 801.9 (2003 ed.). Pursuant to the statute, an out-of-court statement of identification made after the declarant perceives the individual is excluded from the definition of hearsay. A.E.B. v. State, 818 So.2d 534, 535 (Fla. 2d DCA 2002). Although the declarant must testify at trial and be available for cross-examination, the declarant is not required to identify the individual in court or confirm that a prior identification was made. Id. at 535; Eans v. State, 366 So.2d 540, 542 (Fla. 3d DCA 1979). The statute has generally been applied to allow testimony concerning an out-of-court identification in a lineup, a photopack, or a showup.[2]See A.E.B., 818 So.2d at 535 (showup); Lewis v. State, 777 So.2d 452, 453-54 (Fla. 4th DCA 2001) (showup); Ferreira v. State, 692 So.2d 264, 265 (Fla. 5th DCA 1997) (photopack); Brown v. State, 413 So.2d 414 (Fla. 5th DCA 1982) (photopack). A lineup was involved in Eans, 366 So.2d 540, a case decided before the effective date of the evidence code.
Florida courts have limited the scope of section 90.801(2)(c) to exclude statements containing descriptions or accusatory narratives. In Puryear v. State, 810 So.2d 901, 903-04 (Fla.2002), the Florida Supreme Court confirmed that testimony concerning a victim's out-of-court description of her assailant was not admissible into evidence as a statement of identification because a description is not an identification. In Stanford v. State, 576 So.2d *740 737 (Fla. 4th DCA 1991), the Fourth District considered whether testimony concerning a victim's statements naming the defendant as his assailant was properly admissible into evidence pursuant to section 90.801(2)(c). Although the court ultimately found the admission of the testimony to be harmless error, it held that a statement in the form of a narrative naming the person who committed the crime is not admissible as a statement of identification. The Fourth District explained:
We believe that the typical situation contemplated by the code and the case law is one where the victim sees the assailant shortly after the criminal episode and says "that's the man." Hence, the phrase "identification of a person made after perceiving him" refers to the witness seeing a person after the criminal episode and identifying that person as the offender. We do not believe this code provision was intended to allow other out-of-court statements by a witness to others naming the person that the witness believes committed the crime. To extend the rule that far would permit countless repetitions by a witness to others, regardless of time and place, of the witnesses' belief as to the guilty party, a result we do not believe intended by the drafters of the rule.
Id. at 739-40 (footnote omitted). To the same effect is State v. Richards, 843 So.2d 962, 966-67 (Fla. 3d DCA 2003). A statement by the victim that he was confident of his ability to identify his assailant did not qualify as a statement of identification. Simmons v. State, 782 So.2d 1000, 1001 (Fla. 4th DCA 2001). A police officer's testimony in a prosecution for burglary that a witness reported seeing "two black men prowling around the neighborhood" was not admissible under section 90.801(2)(c). Hendrieth v. State, 483 So.2d 768, 769 (Fla. 1st DCA 1986). Therefore, accusatory statements in the form of a narrative are not admissible into evidence pursuant to section 90.801(2)(c). But see Liscinsky v. State, 700 So.2d 171 (Fla. 4th DCA 1997) (holding testimony that witness to crime identified defendant by name as perpetrator at initial investigation immediately following incident was admissible under section 90.801(2)(c) or, in the alternative, was harmless error).[3]
The tape-recorded statements of the recanting witnesses were largely accusatory narratives that recited the witnesses' accounts of the shooting and Smith's role in it. Therefore, the statements were not admissible in their entirety under section 90.801(2)(c) as statements of identification. See Puryear, 810 So.2d 901; Richards, 843 So.2d 962; Simmons, 782 So.2d 1000; Stanford, 576 So.2d 737. The expansive view of section 90.801(2)(c) contended for by the State would seriously erode the rule that a witness's prior inconsistent statements are admissible for impeachment purposes only and not as substantive evidence. See § 90.608(1); Delgado-Santos, 497 So.2d 1199; Ivery, 548 So.2d 887. It would also infringe the defendant's right to confront adverse witnesses. See U.S. Const., amend. VI and XIV, § 1; art. I, § 16, Fla. Const. For these reasons, the trial court erred in failing to exclude the statements from introduction into evidence.[4]See A.E.B., 818 So.2d at 536-37.

*741 Excited Utterance
Finally, the State argues that the portions of the tape-recorded statements in which the recanting witnesses recounted their versions of Smith's alleged statements following the shooting were properly admissible under the "excited utterance" exception to the hearsay rule. See § 90.803(2); Rogers v. State, 660 So.2d 237, 240 (Fla.1995); see generally Charles W. Ehrhardt, Florida Evidence § 803.2 (2003 ed.). The State did not offer this rationale in the trial court, and its argument is unavailing for several reasons. First, the State did not establish a proper predicate for the admission of Smith's alleged statements as excited utterances in the trial court, and the trial court made no finding that the statements were admissible as excited utterances. See Stoll v. State, 762 So.2d 870, 873-74 (Fla.2000). Second, the statements themselves constituted hearsay within hearsay. Therefore, they were inadmissible unless both statements conformed to a hearsay exception. See § 90.805; Hill v. State, 549 So.2d 179, 181 (Fla.1989). That was not the case here. Third, even if the relatively small segments of the tape-recorded statements containing the exclamations attributed to Smith were admissible into evidence, this would not authorize the playing of the audiotapes in their entirety as was done at Smith's trial.
The trial court's ruling permitting the State to play the statements of the recanting witnesses for the jury as substantive evidence cannot be justified under any theory. The remaining question is whether the trial court's ruling constituted harmless error.

Harmless Error Analysis
The error in permitting the tape-recorded statements of the recanting witnesses to be played in their entirety for the jury as substantive evidence requires reversal of Smith's convictions and sentences unless the State can demonstrate that it was harmless error. The harmless error test "places the burden on the State, as the beneficiary of the error, to prove beyond a reasonable doubt that the error complained of did not contribute to the verdict or, alternatively stated, that there is no possibility that the error contributed to the conviction." State v. DiGuilio, 491 So.2d 1129, 1138 (Fla.1986).
Absent the tape-recorded statements of the recanting witnesses, the State's case against Smith was tenuous. Smith did not confess. There was no physical evidence linking him to the offenses charged. Mae Kafus testified that she heard a voice that she thought belonged to Smith say, "Oh, Lord, I killed somebody," but she was uncertain of her identification of the voice. Mae Kafus questioned the accuracy of her own perception and recollection of events because of the effects of medication and stress. Betty Jean Smith testified that she saw an African American man with dreadlocks leave the area in the victim's pickup truck, but she denied that the man she saw was Smith. Katrina Thomas placed Smith at *742 the scene, but she testified that he did not have a gun and that he did not make any incriminating statements after the shooting. None of these three witnesses identified Smith as the person who shot Mabry.
The State used the recanting witnesses' tape-recorded statements to identify Smith as the shooter. In closing arguments, the prosecutor reviewed the tape-recorded statements at length to argue Smith's guilt. The prosecutor urged the jury to "just recall what the witnesses said, both on tape and on the stand." (Emphasis supplied.) The jury deliberated for three hours into the evening and returned with a request to hear Jason Kafus' interview again. The following morning, the jury listened once more to Detective Brown's interview with Jason Kafus. One-half hour after the playing of the tape was concluded, the jury returned its verdicts of guilty. Under these circumstances, the error was not harmless. Smith's convictions and sentences must be reversed and the case remanded for a new trial.[5]
Reversed and remanded for a new trial.
ALTENBERND, C.J., Concurs.
CANADY, J., Dissents with opinion.
CANADY, Judge, Dissenting.
I dissent from the majority's conclusion that the admission of the tape-recorded statements at trial requires the reversal of Smith's convictions. Because I conclude that the crucial portions of the recorded statements were admissible as statements of identification under section 90.801(2)(c) and that any error with respect to the admission of other portions of the recorded statements was not harmful, I would affirm Smith's convictions.
As the majority apparently acknowledges, it is well-established that "[s]ection 90.801(2)(c) applies regardless of whether the declarant identifies the individual in court. The failure of the witness to repeat the identification in court does not affect the admissibility of evidence of the prior identification." Ehrhardt, Florida Evidence § 801.9; see also Brown, 413 So.2d at 416 ("[I]t appears the jury could have believed the prior identification, despite the in-court doubts and denials."); United States v. Shryock, 342 F.3d 948, 982 (9th Cir.2003) (holding that "prior identification of [defendant] was admissible nonhearsay" where witness denied identification at trial). A prior statement of identification is thus admissible under section 90.801(2)(c) as substantive evidence to refute the testimony of witnesses who have changed their story at trial.
Notwithstanding the admissibility of out-of-court statements of identification made by a witness testifying at trial, the majority has concluded that Smith's convictions which rest on such statements of identificationmust be reversed. The majority bases the reversal of Smith's conviction on its conclusion that "accusatory statements in the form of a narrative are not admissible into evidence pursuant to section 90.801(2)(c)." In support of this conclusion, the majority observes that the State's position in support of the admission of the tape-recorded statements "would seriously erode the rule that a witness's prior inconsistent statements are admissible *743 for impeachment purposes and not as substantive evidence." The majority further states that the admission of such evidence would "infringe the defendant's [constitutional] right to confront adverse witnesses."
The majority also apparently takes the view that testimony relating to the "statements that concerned the recanting witnesses' selection of Smith's photograph from the photopack" could have been properly introduced under section 90.801(2)(c). In connection with this, the majority expresses no opinion regarding whether the "limited segments of the tape-recorded statements" regarding the identification of Smith from his photograph might properly have been played for the jury but observes that "the better practice would [be] to lay a proper foundation under section 90.801(2)(c) and elicit testimony from [the detective who conducted the taped interviews] about the out-of-court identifications."
The majority opinion, in my view, places unreasonable limitations on the admission of evidence that is highly relevant and probative and that is specifically made admissible under section 90.801(2)(c). From the majority's opinion, we know that too much "narrative" was presented to the jury, but we do not know precisely what portions of the statements constituted admissible statements of identification. Although the precise parameters of the limitations on statements of identification are not made clear by the majority, the majority opinion manifests an unmistakable inclination to minimize the admission of evidence pursuant to section 90.801(2)(c).

The Admissibility of Tape-Recorded Statements
The majority's unduly restrictive approach is illustrated by its statement admittedly in dictathat the better practice would be not to play even the portions of the audiotapes containing statements that would properly be admissible under section 90.801(2)(c). There is no reason, however, that the admissible portions of a properly authenticated tape should not be played for the jury. See Odom v. State, 403 So.2d 936, 940 (Fla.1981). Adequate safeguards can be established by the trial court to ensure that the inadmissible portions of such a tape are not presented to the jury. The jury should not ordinarily be denied direct access to admissible out-of-court statements of identification which have been tape recorded. See Kendall v. State, 790 N.E.2d 122 (Ind.Ct.App.2003) (holding that trial court did not err in permitting playing of taped out-of-court statement of witness identifying defendant as perpetratoras substantive evidence when witness gave inconsistent testimony at trial); State v. Reaves, 130 Ohio App.3d 776, 721 N.E.2d 424, 430 (1st Dist. 1998) (holding that recanting witness's "taped statements of identification were properly admitted as substantive evidence"); cf. Cooper v. State, 856 So.2d 969, 980 (Fla.2003) (holding that admission of audiotape recording of 911 call was proper).
A tape recording of the words uttered by a declarant can undoubtedly be powerful evidence. But thatwithout moreis hardly a reason to exclude the tape recording. Absent a showing pursuant to section 90.403 that the "probative value" of such evidence "is substantially outweighed by the danger of unfair prejudice," the rules of evidence do not permit the exclusion of such evidence. Here, there is nothing suggesting that there is any danger of unfair prejudice to Smith from the admission of the admissible portions of the audiotapes.

The Scope of Statements of Identification Under Section 90.801(2)(c)
For the identification of a person to have any practical significance and legal relevance, *744 the identification must be correlated with some specific conduct of the person identified. The majority's conclusion that "accusatory statements in the form of a narrative" are inadmissible as statements of identification does not take into account the reality that a statement of identification will necessarily consist of some narrative concerning the conduct of the person identified and ordinarilyat least in criminal caseshave an accusatory character.
These are typical simple statements of identification: "That's the man who shot me." "The person in the photograph is the person who robbed the bank." These illustrative simple statements of identification demonstrate that any statement of identification necessarily involves some description a narrativeof the identified person's conduct. They also demonstrate that such statements can have an unmistakable accusatory character. A reasonable interpretation of section 90.801(2)(c) requires that the permissible scope of the content of a statement of identification be broad enough to establish the practical significance and legal relevance of the out-of-court identification. Labeling a statement as an accusatory narrative does nothing to further the analysis that is required under the statute.
I acknowledge that in A.E.B. this court drew a distinction between properly admitted prior statement of identification and inadmissible hearsay "accusatory statements" made by a witness to an investigating officer. 818 So.2d at 536. In determining that the admission of those "accusatory statements" required reversal of the conviction, the A.E.B. court relied on Caruso v. State, 645 So.2d 389, 394 (Fla.1994), a case which does not address the admission of statements of identification pursuant to section 90.801(2)(c). A.E.B. did not, however, describe the content of the "accusatory statements" that required reversal. The court did not discuss how those inadmissible statements related toor did not relate tothe properly admitted statement of identification. A.E.B. thus affords no guidance on the proper scope of a statement of identification under section 90.801(2)(c).
Other courts have acknowledged that an identification must be placed in context in order for it to have meaning and that some description of the conduct of the identified person is permissible. The court in Johnson v. United States, 820 A.2d 551, 559 n. 4 (D.C.Ct.App.2003), recognized that for a prior out-of-court statement of identification "[t]o be understandable and therefore probative, [the] identification must have context." In Johnson, the court held that a recanting witness's transcribed, prior statement identifying the gunmen and describing the shooting was properly admissible as a nonhearsay statement of identification. Porter v. United States, 826 A.2d 398, 410 (D.C.Ct.App.2003), held that when a witness has made a prior out-of-court statement of identification an account of [the witness's] description of the offense itself is admissible only to the extent necessary to make the identification understandable to the jury." The Porter court stated that although "there were instances when the witness exceeded the permissible bounds [in] recounting details of [the victim's] account of the offense unnecessary to make the identification understandable," nonetheless "much of the story came in properly to identify [the defendant] as the person who committed a particular criminal act." 826 A.2d at 410, 411. See also Brown v. United States, 840 A.2d 82 (D.C.Ct.App.2004) (holding that various out-of-court statements of witness describing defendant's conduct were properly admissible as nonhearsay statements of identification).
*745 In the instant case, the tape-recorded statements of the recanting witnesses admittedly contained details that went beyond what was necessary to establish the context for their identification of Smith. But Smith's conviction should be reversed on the basis of any error of the trial court in admitting portions of the tape-recorded statements other than the actual statements of identification only if that error was properly preserved and was harmful. To determine whether the improper admission of portions of the tape-recorded statements was harmful error, it is necessary to identify the portions of the statements that were properly admitted. See DiGuilio, 491 So.2d at 1135.
Before reviewing the details of the tape-recorded statements, it should be noted that each of the tape-recorded statements included the identification of Troy from a photograph in a photopack presented by the detective conducting the interview.[6] The fact that the statements of identification did involve the identification of Troy from a photograph removes this case from the category of cases where the alleged perpetrator of the crime is identified by name to the police without the use of a photograph or in-person identification. In this case, we therefore need not address the issue of whether such statements of identification made without the use of a photograph or in-person identification are properly admissible under section 90.801(2)(c) as statements "of identification of a person made after perceiving the person." Compare Liscinsky v. State, 700 So.2d 171 (Fla. 4th DCA 1997), with Stanford v. State, 576 So.2d 737 (Fla. 4th DCA 1991).

The Statements Identifying Smith[7]
In the recording of Chad Moreland's statement, after recounting the time and place of the incident "where somebody got shot," Moreland stated that "Troy" shot a shotgun once at a truck, after which the truck slowed down, swerved, hit a stop sign, and went into the bushes. Moreland's statement also included details about the sequence of events that occurred prior to the shooting, as well as what "Troy" did and said after he fired the shot. Among other things, Moreland's statement indicated that after the shooting "Troy" said something like, "I just killed that cracker," or "I just killed him." Moreland identified Troy from a photopack"without a doubt in [his] mind"as the individual who had fired the shot.
In Iris Moreland's recorded statement, the time and location of the incident in question were established and Ms. Moreland stated that she heard two gun shots and then saw "them come running through the path ... Troy with the gun." She further stated that Troy "hollered, `I killed that cracker.'" Ms. Moreland went on to relate the sequence of events that occurred subsequently. At the conclusion of the taped interview, Ms. Moreland identified Troy from a photograph in a photopack.
*746 The third taped statement played for the jury was given by Jason Kafus. After establishing the relevant time and place, Kafus recounted what he had been doing prior to the shooting incident. He then described the entry of the victim's truck into the neighborhood where the shooting occurred. He related additional circumstances and events that preceded the shooting. Kafus then stated, "Troy fired the gun." He went on to describe the aftermath of the shooting. Kafus stated that Troy "started goin' crazy.. [..] `Somebody shoot me.' ... Yeah, he kept tellin' me again like, `Somebody shoot we [sic].. [..]' He want [sic] somebody to kill him. An [sic], `Oh I shot him.' He like cryin' and stuff.... He said, `Oh, I shot the man. Oh, I shot the man[,]'[ ] you know." Kafus related additional details of what occurred after the shooting, including the content of his discussions with others concerning the incident and comments he had heard about the incident. As with the other two interviews, this interview was concluded with the presentation of a photopack. Kafus identified a photograph of Troy as the shooter.
In the tape-recorded statements played for the jury at trial, the portions of the recordings containing statements of the witnesses establishing the time and place of the incident and the fact that Troy who was identified from a photograph by each witnesshad shot the gun at the truck in which the victim was located were admissible as statements of identification under section 90.801(2)(c). In addition, the statements relating that Troy said "I killed that cracker" (or other words to that effect) while departing the scene with a gun in hand would similarly be admissible as statements of identification. The latter statementseven without the direct identification of Troy as the shooterwould be highly probative regarding the identity of the shooter. Those statements related to conduct of the identified person so closely tied to the alleged criminal act at issue that it is reasonable also to admit them as part of the statements of identification.
These crucial portions of the recorded statementsidentifying Troy as the shooter and as the person who left the scene carrying a gun and exclaiming, "I killed that cracker"were necessary to give meaning to the identification of the photograph of the person known to the witnesses as Troy. Their admission into evidence was proper under section 90.801(2)(c).

Impeachment Evidence and Harmless Error Review
While I concede that the trial court erred in admitting as substantive evidence the other portions of the tape-recorded statements that were inconsistent with the trial testimony, those portions were nonetheless admissiblesubject to a proper limiting instructionunder section 90.608(1) to impeach the in-court testimony of the recanting witnesses. Although the trial court's failure to give a proper limiting instruction was an error, I would conclude that there is "no reasonable possibility that the error contributed to the conviction." DiGuilio, 491 So.2d at 1135.
The transcript of the trial makes clear beyond any doubt that the success of Smith's defense hinged on whether the jury believed the version of events contained in the tape-recorded statements of identification which were properly admitted as substantive evidence, or instead believed the testimony given by the recanting witnesses at trial. "[A]n examination of the entire record ... including a close examination of the permissible evidence on which the jury could have legitimately relied[] and in addition an even closer examination of the impermissible evidence which might possibly have influenced the *747 jury verdict" leads to the conclusion that the admission of the portions of the tape-recorded statements beyond the scope of the statements of identification was not harmful error. Id.
There is no reason to believe that anything in the portions of the tape-recorded statements that were inadmissible under section 90.801(2)(c) influenced the jury to assign a level of credibility to the statements of identification that would have been lacking if those portions had been properly introduced for impeachment subject to a limiting instruction. The full tape-recorded statements simply provide additional details concerning what transpired before and after the shooting. They do not add any particular details that strengthen the probative force of the properly admitted statements of identification. Nor do they add any details that cast Smith in a negative light.
The permissible evidence here included three unequivocal and highly probative statements linking Troy directly to the shooting. The impermissible evidence which was only impermissible to the extent it was not introduced subject to a proper limiting instructionconsisted of incidental information about the shooting's prelude and aftermath. All of this points to the conclusion that, beyond a reasonable doubt, the verdict reached by the jury would have been no different if the portions of the tape recordings not admissible as substantive evidence had been subjected to a proper limiting instruction. There is simply no basis for concluding that there is a reasonable possibility that the jury's verdict was influenced by the purely incidental information that was admitted without a proper limiting instruction.
The majority's opinion cites nothing in the portions of the tape-recorded statements not admissible under section 90.801(2)(c) that specifically bolsters the actual statements of identification or that would have otherwise influenced the jury to reach a guilty verdict. Indeed, the majority's harmless error analysis erroneously assumes that no portion of the recorded statements should have been admitted either as substantive evidence or for impeachment of inconsistent trial testimony. That assumption leads the majority to ignore "permissible evidence on which the jury could have legitimately relied." Id.

Statements of Identification as Substantive Evidence
The majority makes the point that the State's view of section 90.801(2)(c) would "seriously erode the rule that a witness's prior inconsistent statements are admissible for impeachment purposes only and not as substantive evidence." This is a curious point that the majority supports by the citation of decisionsDelgado-Santos and Iverywhich do not address section 90.801(2)(c). The problem with the State's position is not that it would erode the general rule that a witness's prior inconsistent statements are admissible for impeachment purposes only but that it would stretch the admission of substantive evidence under section 90.801(2)(c) beyond what can reasonably be considered a statement of identification.
Whatever one may think of the policy underlying section 90.801(2)(c), the unmistakable point of that policy is to supplant not merely erodethe rule limiting the admission of inconsistent out-of-court statements as substantive evidence when the declarant testifies at the relevant trial or hearing and the out-of-court statement is "[o]ne of identification of a person made after perceiving the person." § 90.801(2)(c). See Dep't of Health & Rehabilitative Servs. v. M.B., 701 So.2d 1155, 1161-62 (1997) ("Under section 90.801(2)(c)... [an] out-of-court statement of identification is considered non[ ]hearsay and, *748 thus, `is admissible in court to prove the truth of the matter asserted, e.g., to prove that the person identified was the person who committed the act.' Charles W. Ehrhardt, Florida Evidence § 801.9, at 592 (1996).")[8]. Our task in interpreting the statute is to understand the proper scope of the statements of identification that are admissible under the statute. It is not, as the majority appears to suggest, somehow to limit the impact of the statute on a rule the statute was designed to supercede within the sphere of the statute's operation.

Confrontation Rights
The majority also suggests that the admission of the tape-recorded statements violated Smith's rights under the Confrontation Clauses of the Florida and United States Constitutions. But United States v. Owens, 484 U.S. 554, 560, 108 S.Ct. 838, 98 L.Ed.2d 951 (1988), held that the requirements of the Confrontation Clauses are satisfied with respect to an out-of-court statement of identification whenever the "declarant is present at trial and subject to unrestricted cross-examination." In A.E.B., 818 So.2d at 536, we followed Owens and held that a defendant's "constitutional right of confrontation was not implicated... because [the declarant of an out-of-court identification] was present at trial and subject to cross-examination." The majority does not explain how its suggestion that the admission of the tape-recorded statements infringed Smith's right to confront adverse witnesses can be squared with the United States Supreme Court's decision in Owens and our decision in A.E.B.
In the instant case, the three witnesses whose out-of-court statements of identification were introduced into evidence each testified at trial and were subjected to cross-examination. The fact that they recanted their out-of-court statements does not change the Confrontation Clause analysis. This is true if the witnesses' failure to confirm the earlier identification is the result of a failed memory. See Owens, 484 U.S. 554, 108 S.Ct. 838, and A.E.B., 818 So.2d 534. It is also true if the witness simply repudiates or denies the prior identification. Whatever the reason for the inconsistency between a declarant's prior statement of identification and that declarant's trial testimony, the defendant's right to confront witnesses is protected by the availability of the declarant for cross-examination at trial.

Conclusion
In sum, I conclude that under a fair reading of section 90.801(2)(c) the crucial statements establishing Smith's identity as the perpetrator of the crimes for which he was convicted were properly admissible as substantive evidence and that the error related to the admission of the other portions of the tape-recorded statements was harmless. I therefore would affirm Smith's convictions.
NOTES
[1] Like Betty Jean Smith, Iris Moreland claimed to have heard two gunshots. Katrina Thomas reported hearing only one.
[2] A "showup" has been defined as a "procedure where the police take a witness, shortly after the commission of an observed crime, to where the police are detaining the suspect, in order to give them an opportunity to make an identification." Walker v. State, 776 So.2d 943, 945 (Fla. 4th DCA 2000).
[3] For a further discussion of these issues, see United States v. Kaquatosh, 242 F.Supp.2d 562 (E.D.Wis.2003), which construed Federal Rule of Evidence 801(d)(1)(C) as limited to authorizing admissions of statements of identification made after perceiving the defendant or his likeness and not accusatory statements.
[4] The State requested, and the trial court allowed, the introduction of the audiotapes into evidence in their entirety. Therefore, the question of whether the State might properly have played for the jury the limited segments of the tape-recorded statements that concerned the recanting witnesses' selection of Smith's photograph from the photopack is not before us, and we express no opinion on it. However, we do observe that whether or not these limited segments of the tape-recorded statements might properly have been played for the jury, the better practice would have been to lay a proper foundation under section 90.801(2)(c) and elicit testimony from Detective Brown about the out-of-court identifications instead of playing the audiotapes. This would eliminate the possibility of exposing the jury to inadmissible evidence contained within the tape-recorded interviews.
[5] Because Smith's case must be retried, we mention another aspect of Smith's trial that was not argued in the briefs filed in this appeal. The prosecutors played for the jury the audiotapes of two lengthy interviews with Smith by sheriff's deputies. Upon retrial, if the State again seeks admission of these tape-recorded interviews into evidence, we suggest that the trial court consider whether some statements by Smith or the interrogating officers or both should be redacted. See §§ 90.403, 90.801-.802; Martinez v. State, 761 So.2d 1074, 1079 (Fla.2000); Worden v. State, 603 So.2d 581, 583 (Fla. 2d DCA 1992).
[6] I also note that each statement was made after the declarant was placed under oath by the interviewing detective. Section 90.801(2)(a) provides that prior statements "given under oath subject to the penalty of perjury at a trial, hearing[,] or other proceeding or in a deposition" are admissible as nonhearsay testimony when such statements are inconsistent with the declarant's testimony at trial. Although the recorded statements here were given under oath, it has been held that an interview by an investigating law enforcement officer does not fall within the scope of the "other proceeding[s]" referred to in section 90.801(2)(a). See Delgado-Santos, 497 So.2d 1199; see also Ellis v. State, 622 So.2d 991 (Fla.1993).
[7] It appears undisputed that the person identified by the witnesses was Smith.
[8] I note that there are circumstances where out-of-court statements as the sole evidence of guilt have been determined insufficient to support a guilty verdict. See State v. Moore, 485 So.2d 1279 (Fla.1986); Anderson v. State, 655 So.2d 1118 (Fla.1995); State v. Green, 667 So.2d 756 (Fla.1995); Andreu v. State, 696 So.2d 1220 (Fla. 2d DCA 1997); see also M.B., 701 So.2d 1155. Here, however, the testimony of Mae Kafus at trial corroborated the out-of-court statements of identification.